# *VIRGINIA:*

*In the Court of Appeals of Virginia on* **Wednesday** *the* **5th** *day of* **November, 2025**.

Terry Eugene Michel, Appellant,

against      Record No. 0338-24-3
Circuit Court Nos. CR23053550-00 and CR23053551-00

Commonwealth of Virginia, Appellee.

Upon a Rehearing En Banc

Before Chief Judge Decker, Judges Beales, O'Brien, AtLee, Malveaux, Athey, Fulton,
Causey, Friedman, Chaney, Raphael, Lorish, Callins, White, Frucci and Bernhard

Aaron B. Houchens (Aaron B. Houchens, P.C., on briefs),
for appellant.

Angelique Rogers, Assistant Attorney General (Jason S. Miyares,
Attorney General, on briefs), for appellee.

By memorandum opinion dated April 15, 2025, a panel of this Court, with one judge dissenting, reversed the trial court's judgment of two counts of felony animal cruelty and set aside the jury verdicts. We granted the Commonwealth's petition for rehearing en banc and stayed the mandate of that decision.

Upon rehearing en banc, the judgment of the trial court is affirmed without opinion by an evenly divided Court. *See* Code § 17.1-402(E). Accordingly, the opinion previously rendered by a panel of this Court on April 15, 2025, is withdrawn and the mandate entered on that date is vacated. The appellant must pay to the Commonwealth of Virginia $150 damages.

Chief Judge Decker, Judges Beales, O'Brien, AtLee, Malveaux, Fulton, White, and Frucci voted to affirm the judgment of the trial court.

Judges Athey, Causey, Friedman, Chaney, Raphael, Lorish, Callins, and Bernhard voted to reverse said judgment.

It is ordered that the trial court allow counsel for the appellant an additional fee of $500 for services rendered the appellant on the rehearing portion of this appeal, in addition to counsel's costs and necessary direct out-of-pocket expenses.

The Commonwealth shall recover of the appellant the amount paid court-appointed counsel to represent him in this appeal, counsel's costs and necessary direct out-of-pocket expenses, and the fees and costs to be assessed by the clerk of this Court and the clerk of the trial court.

This order shall be certified to the trial court.

Costs due the Commonwealth by
  appellant in Court of Appeals of Virginia:

        Attorney's fee       $2500.00   plus costs and expenses

A Copy,

Teste:

A. John Vollino, Clerk

*original order signed by a deputy clerk of the*
By:   *Court of Appeals of Virginia at the direction*
      *of the Court*

Deputy Clerk

# *VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **27th** *day of* **May, 2025**.

Terry Eugene Michel,                                                                                              Appellant,

 against             Record No. 0338-24-3
                    Circuit Court Nos. CR23053550-00 and CR23053551-00

Commonwealth of Virginia,                                                                                    Appellee.


Upon a Petition for Rehearing En Banc

Before the Full Court


On April 29, 2025, the appellee, by the Attorney General of Virginia, filed a petition requesting that the Court set aside the judgment rendered on April 15, 2025, and grant a rehearing en banc on the issue(s) raised in the petition.

On consideration whereof and pursuant to Rule 5A:35 of the Rules of the Supreme Court of Virginia, the Court grants the petition for rehearing en banc and reinstates the appeal of those issues on the docket.  The Court stays the mandate previously entered in this case pending the Court's en banc decision.

The parties must file briefs in compliance with the schedule set forth in Rule 5A:35(b).

A Copy,

Teste:

A. John Vollino, Clerk

*original order signed by a deputy clerk of the*
By:    *Court of Appeals of Virginia at the direction*
       *of the Court*

Deputy Clerk

Present:   Judges Athey, Callins and Frucci
Argued at Salem, Virginia

TERRY EUGENE MICHEL

v.          Record No. 0338-24-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE CLIFFORD L. ATHEY, JR.
APRIL 15, 2025

FROM THE CIRCUIT COURT OF FRANKLIN COUNTY
Timothy W. Allen, Judge

Aaron B. Houchens (Aaron B. Houchens, P.C., on briefs), for
appellant.

Angelique Rogers, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, on November 2, 2023, the Circuit Court of Franklin County ("trial

court") convicted Terry Eugene Michel ("Michel") on two counts of felony animal cruelty, in

violation of Code § 3.2-6570(F).  On appeal, Michel first assigns error to the trial court for

convicting him of two felony offenses pursuant to Code § 3.2-6570(F) instead of two

misdemeanor offenses pursuant to Code § 3.2-6570(A).  Michel also assigns error to the trial

court for declining to give his requested jury instructions that would have permitted the jury to

find Michel guilty of the misdemeanor offenses in the alternative.  In support, Michel contends

that the trial court erred by failing to bar his felony convictions under Code § 3.2-6570(F) for

"killing" both companion animals as a result of the term "kill" being included as a prohibited

action in Code § 3.2-6570(A) (misdemeanor) while the term "kill" is omitted as a prohibited

action in Code § 3.2-6570(F) (felony).  Since we find that the trial court erred in both its

_____

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

interpretation and application of Code § 3.2-6570 to the facts in this case, we reverse the trial court's judgment.

## I. BACKGROUND[1]

In February of 2023, Michel and his wife, Rhonda Michel ("Rhonda"), resided together in Ferrum, Virginia. The couple jointly owned two black Labrador Retrievers: three-year-old Colby and "a little over" one-year-old Caleb. Michel and Rhonda initially purchased their three-year-old lab, Colby, then they served as foster owners of Caleb before later adopting him from the local humane society. Both dogs lived in the Michel family home and were cared for by the family. Neither dog exhibited aggressive tendencies, and Rhonda testified that Colby, in particular, had a "really sweet" disposition.

On February 7, 2023, Colby and Caleb went missing from the family home. Michel subsequently called 9-1-1 to report that the dogs had been stolen by two unknown men in an older Jeep Cherokee. The Michel family also placed flyers at various locations throughout the community concerning the disappearance of the dogs and providing Rhonda's phone number to contact in the event the dogs were found.

The following week, while crossing Carolina Springs Roads, a local man named Walker Young ("Young") discovered what appeared to be the dogs' deceased bodies. Young contacted Rhonda to report his discovery after acquiring one of the family's flyers at a local restaurant. After being informed by Young of the location of the dogs' bodies, Rhonda contacted the Franklin County Sheriff's Office to report Young's discovery. Franklin County Criminal

---

[1] On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Konadu v. Commonwealth*, 79 Va. App. 606, 610 n.1 (2024) (quoting *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Id.* (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

Investigator Steven McFarling ("Investigator McFarling") was then dispatched to the location of the dogs' bodies as identified by Young.

Upon his arrival, Investigator McFarling found Rhonda, Young, and "several other individuals" viewing the dogs' bodies. Investigator McFarling then "had everyone step away," to allow him to investigate and photograph the scene, and to "preserve[] the collection of evidence." Michel subsequently arrived at the scene in a white pickup truck while the investigation was occurring. Investigator McFarling observed a hole in the back of one the dogs' heads that he felt was "suspicious." Since the dogs were microchipped, the Franklin County Public Safety team at the scene utilized a chip reader to confirm their identities. The chip reader subsequently confirmed that the bodies located at the scene were Colby and Caleb.

Following the completion of Investigator McFarling's initial investigation that day, an employee of Franklin County Animal Control arrived and transported the dogs' bodies to ViTALS Lab located at Virginia Tech so that the bodies could be preserved for a necropsy. Subsequently, on February 15, 2023, Dr. Teresa Southard ("Dr. Southard"), a veterinary pathologist at Virginia Tech, performed a necropsy on both Caleb and Colby. As a result, she determined that both dogs died from "ballistic trauma" consistent with being shot in the head at "point blank or very near range." The necropsy performed by Dr. Southard also revealed that neither dog suffered "from underlying disease."

The day following the completion of the initial investigation at Carolina Springs Road, Investigator McFarling and another deputy conducted a video-recorded interview with Michel.[2] During the interview, Michel confessed to killing Caleb and Colby. Michel explained that he had initially transported both dogs to a wooded area along Prillaman Switch, a rural road in Franklin County. He admitted to tethering the two dogs together before first shooting Colby in

---

[2] This video was not included in the record before this Court.

the back of the head since he was "closest to [him]." Next, Michel stated that he "froze and looked over at [Caleb]" before shooting the dog to not "give him any chance to think anything else." Michel next admitted to the officers that he had used leaves to hide the dogs' bodies in the wooded area along Prillaman Switch. Michel further admitted to driving to a nearby park where he made the 9-1-1 call[3] alleging that the dogs had been stolen. When asked by the officers why he had killed the dogs, Michel explained that he did so to "save his marriage" because he felt the dogs were damaging his relationship with Rhonda.

Next, Michel admitted that a week after killing the dogs, he moved their bodies to the spot off of Carolina Springs Road, which was "a more public location," because he hoped the new location would increase the likelihood that the bodies "would be discovered." Michel's account was subsequently corroborated by a video recording made by a local woman showing Michel along Carolina Springs Road near where the bodies were found. The video recording provided to law enforcement depicted Michel driving his truck, with two trash cans in the truck bed, near the wooded area where the bodies were ultimately discovered along Carolina Springs Road. After the interview concluded, Investigator McFarling drove to Prillaman Switch where Michel had admitted to killing the dogs. He found what appeared to be dried blood on leaves lying on the ground where the killings occurred.

In addition, Lieutenant J.P. Nolen ("Lieutenant Nolen") obtained a search warrant for Michel's home as well as a warrant for his arrest that he executed later that same day. During the search of the Michel home, Lieutenant Nolen collected a 9mm firearm and ammunition located in the family's upstairs bedroom. He also took photographs of Michel's truck, the trash cans, the firearm, and ammunition. On June 5, 2023, the Commonwealth subsequently sought,

---

[3] The audio recording of this 9-1-1 call is not in the record before this Court.

- 4 -

and a grand jury returned, true bills indicting Michel for allegedly committing two counts of felony animal cruelty in violation of Code § 3.2-6570.[4]

Prior to the scheduled October 4, 2023 jury trial, the parties pre-filed their requested jury instructions. On the morning of the jury trial, Michel requested *in limine* that the trial court rule on three of his proposed instructions prior to the commencement of the trial. Michel's first proposed jury instruction stated that if the Commonwealth failed to prove "that the defendant cruelly or unnecessarily killed an animal, you should find the defendant guilty of killing an animal." His second proposed jury instruction stated that if there was insufficient evidence to prove that Michel "acted cruelly and unnecessarily, then you shall find the defendant guilty of killing an animal." His third instruction would have advised the jury that they "ha[d] been instructed on more than one grade of animal cruelty" and that if the jurors "ha[d] a reasonable doubt as to the grade of the offense, then [they] [were to] resolve that doubt in favor of the defendant and find him guilty of the lesser offense." Counsel for Michel explained to the trial court that the requested instructions were based on his interpretation of Code § 3.2-6570 and that he "d[id]n't care which one the [c]ourt would give." In response, the trial court preliminarily ruled that "the instructions that will be given do not, at this point in time, merit any type of waterfall" instruction. As a consequence, the trial court denied the motion *in limine* to instruct the jury utilizing Michel's three proposed jury instructions "at this point in time."

At trial, Investigator McFarling, Rhonda, and Dr. Southard testified on behalf of the Commonwealth consistent with the aforementioned facts. In addition, Investigator McFarling testified with respect to the chain of custody of the Commonwealth's evidence, including the

---

[4] Michel was also indicted on one count of making a false statement to police in violation of Code § 18.2-461. He pleaded nolo contendere to this count.

dogs' bodies and the photographs he took at the crime scene.[5]  Investigator McFarling also testified that he read Michel his *Miranda*[6] rights prior to his interview with law enforcement. Rhonda confirmed to the jury that the dogs slept in the family home and that although she shared ownership of Caleb and Colby with Michel, she did not consent to his killing of the dogs.  The Commonwealth also entered an authenticated video recording of Michel's interview with law enforcement and an audio recording of his 9-1-1 call, both of which were played for the jury.

Dr. Southard was qualified to testify as an "expert in veterinary necropsy and pathology" before discussing the results of her necropsy of both dogs, noting that the injuries suffered by the dogs were consistent with euthanasia.  Dr. Southard also opined that there were differences between companion animals and agricultural animals and, as a result of those differences, killing a companion animal by gunshot was not an "appropriate way" to euthanize a companion animal. However, she did not testify to any potential harms an animal could suffer from being euthanized in this manner nor did she opine that it was inhumane.  Dr. Southard particularly relied on "a statement by the American Veterinarian Medical Association that the only acceptable way to euthanize a companion animal is by injection of Sodium Pentobarbital, or a barbiturate" through "injection."

On cross-examination, Dr. Southard testified that from her examination of the animals, as evidenced by her report, she discovered "no other injuries, no evidence of torture, no evidence of beating or anything of that nature . . . on the two animals."  She further testified that the "only injury [she observed] was this solitary gunshot wound to the back of the head, which fractured or severed sort of the brainstem."  As a result, she testified that in her opinion, Caleb and Colby

---

[5] The Commonwealth and Michel also stipulated to the entry of other photographic evidence taken from Michel's house.

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

would have suffered "immediate and instantaneous death" as a result of being shot in the back of the head and thus could not have endured "physical suffering." Dr. Southard also opined that "[c]aptive bolt euthanasia," not gunshot, "is approved for [euthanizing] agriculture animals." She also acknowledged that "for many, many years" the use of a single gunshot was a "method of euthanasia that was available for agriculture animals [and] domestic animals as well." In justifying the recent change to veterinarian euthanasia policy, Dr. Southard testified that "we've become more aware of how animals perceive pain and how they can be distressed by things other than physical pain." During cross-examination, Dr. Southard further qualified her testimony by first asserting that "[s]laughter is also instantaneous death, but it's different than euthanasia," and that "this method of fatal gunshot wound that was employed" by Michel "would have been consistent with the practices that were once accepted for euthanasia of both agricultural and domestic animals."

On redirect, the Commonwealth asked Dr. Southard to discuss when euthanizing an animal is needed, to which she opined that "[e]uthanasia by definition is a death that is necessitated by a medical condition or a condition where an animal is dangerous." Dr. Southard also reiterated that during her necropsies of the dogs she did not "see any reason that these animals would need to be euthanized." She also agreed "that the established practice, or former established practices [pertaining to the law], may be different than the law." Dr. Southard was not asked to define "instantaneous death" or to ponder whether an animal could potentially suffer or feel pain from a point-blank gunshot. In fact, on recross-examination, Dr. Southard admitted again that the dogs' gunshot wounds "resulted in instantaneous death."

At the conclusion of the Commonwealth's case-in-chief, Michel moved to strike the evidence pertaining to the felony Code § 3.2-6570 charges, asking the trial court to instead let the case proceed as misdemeanors based off the evidence presented. In support, Michel contended

that based on Dr. Southard's opinion, the dogs did not suffer pain because they died

instantaneously. Hence, the Commonwealth's evidence concerning animal cruelty was

insufficient to prove a violation of Code § 3.2-6570(F). Michel further asserted Code

§ 3.2-6570(A) and (F) apply to both agricultural animals and companion animals. Thus, the rule

of lenity required the trial court to instruct the jury that they could only consider whether Michel

was guilty of a misdemeanor violation under Code § 3.2-6570(A). In response, the

Commonwealth contended that the statutory language regarding a felony conviction for animal

cruelty pursuant to Code § 3.2-6570(F) was unambiguous and specifically proscribed Michel's

conduct. In addressing Michel's argument that the dogs' deaths involved "such a fast killing,

[that] it couldn't possibly have been cruel,"[7] the Commonwealth reiterated that:

> [Michel] maimed those dogs[,] [h]e split their heads. And, you
> know, it doesn't matter if the dog is sensate for any period of
> time. . . . But it is the cruelty of that act itself, which is covered
> under this statute. Cruelly or unnecessarily maims or mutilates any
> dog that is a companion animal.[8]

Following argument on the motion to strike, the trial court denied Michel's motion to

strike, ruling that the statutory language in Code § 3.2-6570 was unambiguous, and based on the

Commonwealth's evidence, the jury could reasonably find that Michel's conduct was a felony

offense pursuant to the statute. In response to Michel's assertion that Code § 3.2-6570 either

provided for two degrees of culpability or, in the alternative, the language of the statute was

ambiguous, the trial court opined:

---

[7] The Commonwealth did not argue that Michel's conduct constituted or caused an inhumane injury in opposition to Michel's motion. The only time the Commonwealth asserted that Michel's conduct could constitute a "willfully inflicted inhumane injury or pain on a dog" was in its closing arguments.

[8] The Commonwealth appears to have misquoted the language of the statute in this part of the transcript, blending the misdemeanor offense under Code § 3.2-6570(A) with the felony offense under Code § 3.2-6570(F).

> [Defendant's counsel], you make an interesting argument. You actually said something just right now that I thought about. It does create a different degree somewhat of culpability. But I would say this, this statute -- you know, your argument is that it's very ambiguous. I don't see that ambiguity the way you do.
>
> At this point in time, this statute is somewhat analogous to some of the drug statutes. When you start out at the drug statutes, they say you're guilty of or these are elements of possession or distribution, and then the statute goes on further and then enhances the culpability, depending on the specifics of what the particular drug was or the amount of the drug.
>
> And I view this particular statute in somewhat the same way. It does make an overall broad statement under subsection A, but then it goes on to subsection F and then it categorized it. It ups the degree of culpability by adding the word companion to the animal.

In his own defense, Michel proffered the expected testimony of Dr. Sharon Kelly ("Dr. Kelly"), who would have testified to evaluating Michel and diagnosing him with post traumatic stress disorder. Dr. Kelly was also expected to testify that Michel had been on depression medication at the time he killed the dogs. Based thereon, Dr. Kelly would have questioned whether Michel possessed the requisite mental state necessary to be convicted of the crimes in question.[9] At the conclusion of all the evidence, Michel renewed his motion to strike on the same grounds. The Commonwealth presented no further argument, and the trial court again denied Michel's renewed motion to strike on the same grounds. The trial court this time opined:

> [Defense counsel], I do understand your argument, I just don't think that at this point in time -- even at this point in time with the shift in the burden, I am going to overrule your motion to strike. I think the statute itself is clear enough and not ambiguous enough where the case needs to go forward. I think the exception or the differentiation that's carved out in subsection F is done so -- as I said, it's sort of analogous to some of the drug statutes, where they

---

[9] Michel does not contend on appeal that the trial erred in determining that his mental state was sufficient to convict him of the offenses in question. As such, we do not consider any such challenge. Rule 5A:20.

make the enhanced punishment due to different amounts or different categories of types of drugs and stuff.

The trial court then heard argument concerning the proffered jury instructions submitted by the Commonwealth and Michel. The trial court again declined to give Michel's three jury instructions previously denied pretrial, stating that the court "d[i]dn't think that type of waterfall instruction [wa]s merited with the evidence that we have [in the record]." Counsel for Michel noted his objection to the trial court refusing to instruct the jury consistent with his three previously filed instructions. The trial court then instructed the jury with respect to the law, the parties engaged in closing argument, and the jury retired to begin its deliberations. The jury subsequently returned its verdict convicting Michel of two counts of felony cruelty to animals in violation of Code § 3.2-6570(F). Following a sentencing hearing, by final order entered on November 27, 2023, the trial court sentenced Michel to 6 years and 12 months of incarceration, with 4 years and 21 months suspended. Michel appealed.

## II. ANALYSIS

### A. *Standard of Review*

"[T]o the extent the appellant's assignment of error requires 'statutory interpretation, it is a question of law reviewed de novo on appeal.'" *Creekmore v. Commonwealth*, 79 Va. App. 241, 247 (2023) (quoting *Coomer v. Commonwealth*, 67 Va. App. 537, 545 (2017)). "This same *de novo* standard of review applies to determining the proper definition of a particular word in a statute." *Id.* (quoting *Jones v. Commonwealth*, 68 Va. App. 304, 307 (2017)). And "[i]ssues of statutory construction are questions of law which are reviewed *de novo*." *Suhay v. Commonwealth*, 75 Va. App. 143, 155 (2022) (quoting *Fletcher v. Commonwealth*, 72 Va. App. 493, 502 (2020)). If the circuit court errs in "interpreting a statute, that error itself constitutes an abuse of discretion" as a matter of law. *Walker v. Commonwealth*, 78 Va. App. 52, 64 (2023).

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

B. *The trial court erred by denying Michel's motion to strike because Code § 3.2-6570(F) unambiguously requires evidence proving that the injury inflicted by Michel was "inhumane" or that the injury was inflicted "cruelly," in causing each dog's death.*[10]

Michel assigns error to the trial court's decision to deny his motion to strike at trial, contending that the trial court erred by ruling sufficient evidence existed to support convicting him under Code § 3.2-6570(F). Michel contends that the trial court also erred in doing so by

---

[10] Michel's appeal was preserved for appellate review at least under his first assignment error by his several objections to the sufficiency of the evidence used to convict him under Code § 3.2-6570(F), as a sufficiency challenge that asserts insufficient evidence existed under the specific "'statute'" to convict is a sufficiency challenge to "all of the elements of the statute." *Commonwealth v. Herring*, 288 Va. 59, 67-69, 73 (2014) (analyzing the application of Rule 5A:12(c)(1)(ii) to an assignment of error that stated "the trial court erred by failing to grant the defendant[']s motion to strike the Commonwealth's evidence as being insufficient as a matter of law to sustain his convictions," finding it to be sufficient to preserve his sufficiency challenge, which included interpretation of the underlying statute (alteration in original)).

"ignor[ing] the statute's plain language which makes killing an animal a misdemeanor under Subsection A of the Statute and only imposes the harsher felony penalty under Subsection F for serious injury which results in death." Michel specifically avers that per the evidence in the record his alleged conduct could only be determined to be a misdemeanor offense under Code § 3.2-6570(A) instead of a felony offense under Code § 3.2-6570(F). He claims that in interpreting Code § 3.2-6570, the trial court erred in finding the term "kill" in Code § 3.2-6570(A) to "only impact[] the degree of culpability regarding [offenses committed against] companion animals" and that the omission of the word "kill" from Code § 3.2-6570(F) limits the application of that subsection to only non-immediate deaths. He also asserts that the use of the term "companion animal" in Code § 3.2-6570(F) is ambiguous and that such ambiguity should disfavor a conviction here under the rule of lenity in interpreting the application of criminal statutes. In response, the Commonwealth contends that Michel's reading of the statute "is contrary to the statute's plain meaning" and would "lead[] to an absurd result." We agree with Michel's argument, in part.

Michel's appeal necessitates the interpretation of the text of both Code § 3.2-6570(A) and Code § 3.2-6570(F) as they pertain to the instantaneous killing of an animal. We begin by analyzing the text of both provisions. *See McGinnis v. Commonwealth*, 296 Va. 489, 504 (2018). To do so, we "apply the plain meaning of the language appearing in the statute unless it is ambiguous or applying the plain language leads to an absurd result." *Commonwealth v. Amos*, 287 Va. 301, 305-06 (2014). "If the statute is clear on its face, we rely on the plain words, and no interpretation is necessary. Only when the statute is ambiguous does the Court look further." *Tanner v. Commonwealth*, 72 Va. App. 86, 99 (2020) (citation omitted). "[W]here the General Assembly has expressed its intent in clear and unequivocal terms, it is not the province of the judiciary to add words to the statute or alter its plain meaning." *Haefele v. Commonwealth*, 75

Va. App. 591, 600 (2022) (quoting *Hill v. Commonwealth*, 73 Va. App. 206, 213 (2021)). "In keeping with this principle, the court must 'examine a statute in its entirety, rather than by isolating particular words or phrases.'" *Street v. Commonwealth*, 75 Va. App. 298, 306 (2022) (quoting *Schwartz v. Commonwealth*, 45 Va. App. 407, 450 (2005)); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 168 (2012) [hereinafter Scalia & Garner] ("[T]he meaning of a statute is to be looked for, not in any single section, but in all the parts together . . . ." (alteration in original) (quoting *Pan. Refin. Co. v. Ryan*, 293 U.S. 388, 439 (1935) (Cardozo, J., dissenting))). "A statute is ambiguous if 'the text can be understood in more than one way or refers to two or more things simultaneously [or] [if] the language is difficult to comprehend.'" *Commonwealth v. 1887 Holdings, Inc.*, 77 Va. App. 653, 664 (2023) (alterations in original) (quoting *Eley v. Commonwealth*, 70 Va. App. 158, 164 (2019)). And "[a]n absurd result describes an interpretation that results in the statute being internally inconsistent or otherwise incapable of operation." *Commonwealth v. Delaune*, 302 Va. 644, 655 n.1 (2023) (quoting *City of Charlottesville v. Payne*, 299 Va. 515, 532 (2021)).

Code § 3.2-6570(F) in pertinent part states:

> Any person who (i) tortures, willfully inflicts inhumane injury or pain not connected with bona fide scientific or medical experimentation, or cruelly *and* unnecessarily beats, maims, or mutilates any dog or cat that is a companion animal whether belonging to him or another *and* (ii) *as a direct result* causes serious bodily injury to such dog or cat that is a companion animal, the death of such dog or cat that is a companion animal, *or* the euthanasia of such animal on the recommendation of a licensed veterinarian upon determination that such euthanasia was necessary due to the condition of the animal is guilty of a Class 6 felony.[11]

---

[11] The General Assembly has enacted a version of Code § 3.2-6570 since 2008, and this subsection previously required that an animal die because of its injuries for the action to constitute a felony. 2008 Va. Acts ch. 860. Code § 3.2-6570(F), however, was amended in 2019 to allow a felony conviction even if the animal survived its injuries. 2019 Va. Acts ch. 537.

(Emphases added).  Conversely, under Code § 3.2-6570(A) it is a "Class 1 misdemeanor" for "[a]ny person who . . . (ii) tortures any animal, willfully inflicts inhumane injury or pain not connected with bona fide scientific or medical experimentation on any animal, *or cruelly or unnecessarily* beats, maims, mutilates, *or kills any animal*, whether belonging to himself or another."  (Emphases added).  "The term 'companion animal' is defined under this chapter as 'any domestic or feral dog . . . or any animal under the care, custody, or ownership of a person.'"  *Pelloni v. Commonwealth*, 65 Va. App. 733, 738 (2016) (alteration in original) (quoting Code § 3.2-6500).  An "animal" under this statute is defined as "any nonhuman vertebrate species including fish except those fish captured and killed or disposed of in a reasonable and customary manner."[12]  Code § 3.2-6500.

In parsing this text, we naturally assume that "[t]he use of the word 'and' . . . points to the conclusion that it was the intention of the legislature that 'and' should have its ordinary, literal conjunctive meaning."  *Safeway Stores, Inc. v. Milk Comm'n*, 197 Va. 69, 74 (1955).  Thus, where the General Assembly uses "'the conjunctive [term] "and," [it] is clear that *both*' of the conditions separated by the conjunction must be met to satisfy the statutory requirement" in question.  *Chapman v. Commonwealth*, 68 Va. App. 131, 140 (2017) (quoting *Varga v. Commonwealth*, 260 Va. 547, 551 (2000)).  However, it is likewise apparent that the General Assembly's "use of the disjunctive word 'or,' rather than the conjunctive 'and,' [is to] signif[y] the availability of alternative choices."  *Pittman v. Commonwealth*, 69 Va. App. 632, 636 (2019) (quoting *Leftwich v. Commonwealth*, 61 Va. App. 422, 428 n.2 (2013)); *see* Scalia & Garner, *supra*, at 116 ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives.").

---

[12] We agree with the dissent that the terms "animal" and "companion animal" are unambiguous.

- 14 -

Moreover, it is a "settled rule in this Commonwealth that every provision in or part of a statute shall be given effect if possible." *Va. Elec. & Power Co. v. State Corp. Comm'n*, 300 Va. 153, 163 (2021) (quoting *Travelers Prop. Cas. Co. of Am. v. Ely*, 276 Va. 339, 345 (2008)). Under this "elementary canon of construction[,] . . . '[n]o sentence, clause or word should be construed as unmeaning or surplusage[] if a construction can be legitimately found [that] will give force to and preserve all the words of the statute.'" *King v. Empire Collieries Co.*, 148 Va. 585, 589-90 (1927) (quoting Black Inter. Laws 83)). Also, "when the General Assembly has used specific language in one instance but omits that language or uses different language when addressing a similar subject elsewhere in the Code, [the Court] must presume that the difference in the choice of language was intentional." *Morgan v. Commonwealth*, 301 Va. 476, 482 (2022) (alteration in original) (quoting *Zinone v. Lee's Crossing Homeowners Ass'n*, 282 Va. 330, 337 (2011)). We "must rely on this presumption 'because under these circumstances, it is evident that the General Assembly "knows how" to include such language in a statute to achieve an intended objective,' and therefore, omission of such language in another statute 'represents an unambiguous manifestation of a contrary intention.'" *Id.* (quoting *Brown v. Commonwealth*, 284 Va. 538, 545 (2012)).

In enacting Code § 3.2-6570, the General Assembly did not define much of the text that constitutes its felony and misdemeanor offenses, so we "will normally give a word its 'everyday, ordinary meaning unless the word is a word of art.'" *Gonzin v. Commonwealth*, 59 Va. App. 1, 8 (2011) (quoting *Nolen v. Commonwealth*, 53 Va. App. 593, 598 (2009)). To ascertain a term's ordinary meaning, "dictionary definitions and pertinent analysis in prior case law may be consulted," *Ely*, 70 Va. App. at 165, to place its meaning solidly within its grammatical and statutory context. *Bell v. Commonwealth*, 22 Va. App. 93, 98 (1996) ("A word's meaning takes

color and expression for the purport of the entire phrase from which it is taken; meaning must be taken in context.").

Pertinent to the question at bar, we have recently stated in the child cruelty context that "'[c]ruelty' is defined as the 'disposition to inflict pain or suffering.'" *Mollenhauer v. Commonwealth*, 73 Va. App. 318, 335 (2021) (quoting *Cruelty*, *Webster's Third New International Dictionary* (1993)). Dictionaries support the interpretation of "cruelty" we reached in that case, as the term denotes "[t]he intentional and malicious infliction of mental or physical suffering on a living creature," *Cruelty*, *Black's Law Dictionary* (12th ed. 2024), and, when used in the adverb form "cruelly," the term further means "so as to [cause] pain," "mercilessly," or "so as to cause pain or hurt," *Cruelly*, *Webster's Third New International Dictionary* (2003). And contextually, "animal cruelty" has been defined as "[a] malicious or criminally negligent act that causes an animal *to suffer pain or death*."[13] *Animal Cruelty*, *Black's Law Dictionary*, *supra* (emphasis added). Hence, as used in Code § 3.2-6570(F), "cruelly" serves to modify a succeeding verb to describe *how* something is done (e.g., cruelly beat). Giving "cruelly" "the meaning that proper grammar and usage would assign [it]," it follows that as it simply is the adverbial use of the term "cruelty," any difference between the two is not definitional, but *syntactical*. Scalia & Garner, *supra*, at 140.

Inhumane has been defined in one dictionary as meaning "not humane," *Inhumane*, *Webster's Third New International Dictionary* (1961), which further defines "[h]umane" as conduct "marked by compassion, sympathy, or consideration for other human beings or animals," *Humane*, *Webster's Third New International Dictionary* (1961). "Inhumane" may also mean conduct that is "[e]xtremely cruel; causing unacceptable suffering." *Inhumane*, *Black's*

---

[13] We decline to adopt any one of these dictionary definitions as the outright meaning of the term "cruelly," and we only raise them as consistent authority in support of our interpretation that the term encompasses *some showing* of some type of pain and/or suffering.

*Law Dictionary*, *supra*.  Injury has been defined as "[a]ny harm or damage."  *Injury*, *Black's Law Dictionary*, *supra*.  Likewise, the term "beat" has been defined as "to strike . . . [or] hit repeatedly with [a] hand, fist, weapon, or other instrument so as to inflict pain."  *Eberhardt v. Commonwealth*, 74 Va. App. 23, 33 (2021) (alterations in original) (quoting *Beat*, *Webster's Third New International Dictionary* (1993)).  "Maim" means a "type of strength-diminishing injury required to support a charge of mayhem, . . . involving a wound or injury that is both severe and permanent."  *Maim*, *Black's Law Dictionary*, *supra*.  And "mutilate" is defined as "to cut off or permanently destroy a limb or essential part (of a body)" and "to cut up or alter radically so as to make imperfect."[14]  *Mutilate*, *Webster's Third New International Dictionary* (2003).

Where there may be ambiguity in this language, our precedent and that of the Supreme Court of Virginia lecture "that, when determining whether an object falls within [an ambiguous term], . . . the statutory construction rule[] . . . *noscitur a sociis* should be applied."  *O'Banion v. Commonwealth*, 30 Va. App. 709, 719-20 (1999).  "*Noscitur a sociis* is the principle that 'a word is known by the company it keeps,'" *Edwards v. Commonwealth*, 53 Va. App. 402, 411 (2009) (quoting *S.D. Warren Co. v. Maine Bd. of Env't Prot.*, 547 U.S. 370, 378 (2006)), meaning that in application, this "canon . . . counsels that a word 'gathers meaning from the words around it,'"[15] *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 702 (1995)

---

[14] Dictionaries also define "kill" as meaning "[t]o end life; to cause physical death."  *Kill*, *Black's Law Dictionary*, *supra*.

[15] *See also* 2A Norman J. Singer & Shambie Singer, *Sutherland Statutes and Statutory Construction* § 47:16, at 357-58 (7th ed. 2014) (stating that "ordinarily, the coupling of words [in a statutory provision] denotes an intention that they should be understood in the same general sense").  *But see Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 288 (2010) (finding *noscitur a sociis* inapplicable where the terms in the relevant statutory text were "each quite distinct from the other" and any "substantive connection . . . between the terms . . . [wa]s not so tight or so self-evident as to demand that we 'rob' any one 'of them of its

- 17 -

(quoting *Jarecki* v. *G. D. Searle & Co.*, 367 U.S. 303, 307 (1961)).  In this context we apply this canon "where a word is capable of many meanings," *McDonnell v. United States*, 579 U.S. 550, 569 (2016) (quoting *Jarecki*, 367 U.S. at 307), "to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of [the General Assembly],'" *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (quoting *Jarecki*, 367 U.S. at 307).  "Correctly viewed [in this context], the maxim noscitur a sociis means only that 'when general and specific words are grouped, the general words are limited by the specific and will be construed to embrace only objects similar in nature to those things identified by the specific words.'" *Tomlin v. Commonwealth*, 302 Va. 356, 369 (2023) (emphasis omitted) (quoting *Sainani v. Belmont Glen Homeowners Ass'n*, 297 Va. 714, 724 (2019)).  In applying this canon, "[w]hen several nouns or verbs or adjectives or adverbs – any words – are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar." *Sainani*, 297 Va. at 725 (quoting Scalia & Garner, *supra*, at 195).  "The common quality suggested by a listing should be its most general quality – the least common denominator, so to speak – relevant to the context." *Id.* at 726 (quoting Scalia & Garner, *supra*, at 196).

Further, we "read related statutes *in pari materia* in order to give, when possible, consistent meaning to the language used by the General Assembly." *Washington v. Commonwealth*, 272 Va. 449, 455 (2006) (quoting *Indus. Dev. Auth. v. Bd. of Supervisors*, *Montgomery Cnty.*, 263 Va. 349, 353 (2002)).  "[S]tatutes may be considered as *in pari materia* when they relate to the same person or thing, the same class of persons or things or to the same subject or to closely connected subjects or objects." *Prillaman v. Commonwealth*, 199 Va. 401,

independent and ordinary significance'" (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338-39 (1979))).

405 (1957). And "[s]tatutes which have the same general or common purpose or are parts of the same general plan are also ordinarily considered as *in pari materia*." *Id.* But we may only consider statutes "as *in pari materia* when they relate to the same person or thing, the same class of persons or things or to the same subject or to closely connected subjects or objects." *Id.*

And finally, where this Court and the Supreme Court of Virginia have judicially settled the meaning of a statutory term, we apply it, as "considerations of *stare decisis* weigh heavily in the area of statutory construction, where [the legislature] is free to change this Court's interpretation of its legislation." *Turner v. Commonwealth*, 295 Va. 104, 112 (2018) (alteration in original) (quoting *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977)). To note, Code § 3.2-6570(A) and Code § 3.2-6570(F) have been applied to proscribe passive acts of abuse where the defendant declined to act to take care of their animal. *See, e.g.*, *Ingram v. Commonwealth*, 74 Va. App. 59, 77-78 (2021) (finding the defendant's failure to provide the "necessaries" for her dogs to be sufficient to support a misdemeanor conviction under Code § 3.2-6570(A), where the evidence showed multiple emaciated animals suffering from parasites in "deplorable living conditions"); *Pelloni*, 65 Va. App. at 743-44 (finding that the defendant's failure to provide food, water, or desperately needed medical care for his dog amounted to a "'willful[] inflict[ion of] inhumane injury or pain'" under Code § 3.2-6570(F), as evidenced by the fact that the defendant admitted he knew the dog "had been sick for at least a week and watched the [dog] shaking as he died" (alterations in original) (quoting Code § 3.2-6570(F)). It has not, however, been interpreted to date concerning the question before us: whether an "instantaneous death" caused by a single gunshot is proscribed by Code § 3.2-6570(F).

Michel asserts on brief that the trial court erred in interpreting his conduct to constitute a violation under Code § 3.2-6570(F) by misreading the term "kill" in Code § 3.2-6570(A) to be equivalent to the term "maim" in Code § 3.2-6570(F). Conversely, the Commonwealth contends

- 19 -

on brief that the trial court's interpretation should be affirmed because "subsections A and F contain the same intent elements and only differ in the type of victim it protects." On this point, we partially agree with Michel but note different grounds for finding the circuit court in error.

We first examine the text of both provisions. We initially note that Code § 3.2-6570(A) proscribes many more types of conduct than does Code § 3.2-6570(F). Pertinent here, Code § 3.2-6570(A)(ii) punishes those "who . . . torture[] . . ., willfully inflict[] [an] inhumane injury or pain . . ., or cruelly or unnecessarily beat[], maim[], mutilate[], or kill[] any animal, whether belonging to himself or another." For example, a person may violate Code § 3.2-6570(A)(ii) by "tortur[ing] . . ., willfully inflict[ing] [an] inhumane injury or pain . . ., or . . . beat[ing], maim[ing], mutilat[ing], or kill[ing]" an animal either in a "cruel[]" manner or for an "unnecessar[y]" purpose. Thus, it reasonably flows from its plain language that, in order to convict a defendant for violating Code § 3.2-6570(A)(ii), the Commonwealth must prove that the person: 1) "torture[d]"; 2) "willfully inflict[ed] [an] inhumane injury or pain"; *or* 3) "cruelly *or* unnecessarily beat[], maim[ed], mutilate[d], or kill[ed]," any animal without regard to ownership. Code § 3.2-6570(A)(ii) (emphasis added).

Conversely, the text of Code § 3.2-6570(F) proscribes a more specific and severe offense where the victim animal is a "companion animal." Looking at the entirety of Code § 3.2-6570(F), it can be seen that to obtain a felony conviction for animal cruelty, the Commonwealth must prove the defendant: (1) *either* (i) "torture[d],"[16] (ii) "willfully inflict[ed] inhumane injury or pain," *or* (iii) "cruelly *and* unnecessarily beat[], maim[ed], or mutilate[d]"; (2) a "dog or cat that is a companion animal"; and (3) "as a direct result cause[d]" *either* (i)

---

[16] The Commonwealth does not contend that Michel tortured the dogs. Likewise, Michel does not argue that the dogs did not die as a direct result of his actions.

- 20 -

"serious bodily injury to such dog or cat," (ii) "the death of such dog or cat," *or* (iii) "the [necessary] euthanasia of such animal." Code § 3.2-6570(F) (emphasis added).

Notably, Code § 3.2-6570(F) adopts the three actions proscribed by Code § 3.2-6570(A)(ii)—beatings, maimings, and mutilations—while dropping the "kill" term and substituting it with "death" as a "direct result" of these three prohibited actions. *Compare* Code § 3.2-6570(A)(ii), *with* Code § 3.2-6570(F). The General Assembly's use of the terms "beat[]," "maim[]," and "mutilate[]" in Code § 3.2-6570(F) but "beat[]," "maim[]," "mutilate[]," *and* "kill[]" in Code § 3.2-6570(A) warns against reading the elements of Code § 3.2-6570(F) broadly. By using "beat[]," "maim[]," "mutilate[]," and "kill[]" with "cruelly or unnecessarily" in Code § 3.2-6570(A), the General Assembly evidenced an intent to proscribe a broad expanse of conduct. Code § 3.2-6570(A). Not so with Code § 3.2-6570(F), which only lists "beat[]," "maim[]," and "mutilate[]," as predicate actions that become proscribed where they "as a direct result" cause either a "serious bodily injury" or "death." As evinced by the above, the words "beat," "maim," and "mutilate" standing alone textually do not encompass the result of death, which would be plainly provided for through the use of the term "kill." As a consequence, these words indicate that to be convicted of the felony offense, the evidence must show that the dogs endured pain or suffering *before* succumbing to their injury "as a direct result" of Michel's gunshots as Code § 3.2-6570(F) does not proscribe killings alone.[17] Further, to be convicted of the misdemeanor offense, the "beat[ing], maim[ing], mutilat[ion], or kill[ing]" may be *either* "cruel[] or unnecessar[y]." Code § 3.2-6570(A). But to be convicted of the felony offense, the "beat[ing], maim[ing], or mutilat[ion]" must be *both* "cruel[] and unnecessar[y]." Code

---

[17] Michel on brief contends that the difference in text between these provisions provides for a "temporal" requirement pertaining to offenses under Code § 3.2-6570(F). We disagree with this description. The language in Code § 3.2-6570(F) makes no reference to the passage of time, but instead makes reference to a causal relationship between the act and its consequence. This relationship by itself involves the passage of time, but time is not the trigger for this offense.

§ 3.2-6750(F). And we "must presume that the difference in the choice of language was intentional." *Morgan*, 301 Va. at 482 (quoting *Zinone*, 282 Va. at 337).

Hence, when comparing these separate subsections, we find that they are unambiguous.[18] Next, we turn to the issue of whether Michel's conduct violated Code § 3.2-6570(F).

Assuming without deciding that the Commonwealth's evidence satisfied the other elements of this portion of the statute, we first find that the evidence adduced at trial is insufficient to prove that Michel acted cruelly in killing the dogs by shooting each animal point blank in the head. We are compelled to reach this conclusion because the record is bereft of any evidence that Michel acted "[c]ruelly" by causing "pain or suffering" as the term "cruelly" requires under *Mollenhauer*. 73 Va. App. at 335 (quoting *Cruelty*, *Webster's Third New International Dictionary* (1993)). In *Mollenhauer*, this Court analyzed the term "cruelly treated"

---

[18] We note that "[l]enity is a rule of statutory construction requiring that a court resolve ambiguities in penal statutes in a defendant's favor." *Sandidge v. Commonwealth*, 67 Va. App. 150, 158 (2016). The rule of lenity "is an ancient maxim of the law that all such statutes must be construed strictly against the state and favorably to the liberty of the citizen." *Morgan*, 301 Va. at 483 (quoting *Sutherland v. Commonwealth*, 109 Va. 834, 835 (1909)). This "maxim is founded on the tenderness of the law for the rights of individuals, and on the plain principle that the power of punishment is vested in the Legislature, and not in the judicial department." *Id.* (quoting *Sutherland*, 109 Va. at 835).

> But "[t]he rule of lenity serves only to resolve genuine ambiguities and 'does not abrogate the well recognized canon that a statute . . . should be read and applied so as to accord with the purpose intended and attain the objects desired if that may be accomplished without doing harm to its language.'"

*Sandidge*, 67 Va. App. at 158 (alterations in original) (quoting *Fitzgerald v. Loudoun Cnty. Sheriff's Off.*, 289 Va. 499, 508 n.3 (2015)). "Thus[,] before we invoke lenity, there must be some statutory ambiguity." *Id.* As we find that this statutory language is unambiguous, we would note the rule of lenity is inapplicable here. In the case of there being an ambiguity, we find that *noscitur a sociis* would compel the same conclusion as noted *infra*, but, to the extent those canons do not resolve the ambiguity, we would find that the dissent's interpretations of the terms "inhumane" and "cruelly" would not meet muster under the strict construction favoring the defendant that is compelled by the rule due to the authorities cited within the majority opinion. *Sandidge*, 67 Va. App. at 158.

provided for in Code § 40.1-103(A), which proscribes child cruelty.  *Id.*  We held specifically

there that the term "cruel" encompassed actions that "inflict pain or suffering" without regarding

the perceived "mercy" undertaken by the defendant.  *Id.*  Hence, we find the meaning of the term

"cruelly" judicially settled in the child cruelty context per *Mollenhauer*.  *See, e.g.*, *Turner*, 295

Va. at 112.

Moreover, the *Mollenhauer* Court's treatment of the term "cruelty" in analyzing the term

"cruelly" applies with full force here through the doctrine of in pari materia.  *See Pelloni*, 65

Va. App. at 740 n.3 ("When a particular section of the Code does not define certain terms within

that section, '[u]nder settled legal principles, . . . "the Code of Virginia constitutes a single body

of law, and other sections can be looked to where the same phraseology is employed."'"

(alterations in original) (quoting *Hart v. Commonwealth*, 18 Va. App. 77, 79 (1994))).  Per this

doctrine's application "when the legislature uses the same term in separate statutes, that term has

the same meaning in each unless the General Assembly indicates to the contrary."  *Gerald v.*

*Commonwealth*, 68 Va. App. 167, 174 (2017) (quoting *Barson v. Commonwealth*, 284 Va. 67, 74

(2012)).  And the General Assembly has not indicated such in Code § 3.2-6570(F).

Here, as the General Assembly used the same term "cruelly" in Code § 3.2-6570(F) that

is contained within Code § 40.1-103(A), the statute analyzed by this Court in *Mollenhauer*, we

conclude its interpretation, as applied in pari materia, requires us to interpret the term "cruelly"

in a similar manner.  If we were to interpret the term differently, our interpretation would cause

an interpretative inconsistency between the statutes and contradict this Court's published

opinion.  *Mollenhaurer*, 73 Va. App. at 335.  Therefore, we find *Mollenhauer*'s application

requires the term "cruelly" in Code § 3.2-6570(F) to require the Commonwealth to prove that

Michel's actions caused some "pain or suffering."  *Id.*  Additionally, pertinent dictionary

authorities defining "cruelly" and "cruelty" support this conclusion, denoting that the term

"cruelty" (the noun form of "cruelly") means conduct causing "mental or physical suffering on a living creature," *Cruelty*, *Black's Law Dictionary*, *supra*, and that "cruelly" describes conduct undertaken "so as to [cause] pain," or "so as to cause pain or hurt," *Cruelly*, *Webster's Third New International Dictionary* (2003).

Here, in light of her experience and familiarity with the dogs' injuries from performing their necropsy, the Commonwealth proffered Dr. Southard's testimony in part to contend that Michel's actions were done "cruelly." She, however, explicitly opined when asked that from her necropsy the dogs died instantly from the gunshots and could not have "suffered pain." And the Commonwealth did nothing to qualify, clarify, or contextualize her expert testimony pertaining to the harm suffered by the animals outside of their deaths, only adducing vague statements pertaining to veterinarian practice. The Commonwealth also failed to introduce any other evidence showing that Michel acted "to cause pain or hurt," *Cruelly*, *Webster's Third New International Dictionary* (2003), or to "intentional[ly] and malicious[ly] inflict[] . . . mental or physical suffering," *Cruelty*, *Black's Law Dictionary*, *supra*. Hence, by the Commonwealth's own evidence, the record is devoid of support to show Colby and Caleb endured "pain or suffering." *Mollenhauer*, 73 Va. App. at 335.

The Commonwealth's argument to the contrary does not persuade us. In support of its position that the evidence was sufficient to show that Michel acted "cruelly," the Commonwealth identifies Dr. Southard's silence regarding whether there was evidence of "distress" in the record, as evident from her qualified "no *physical* suffering" admission, and testimony surrounding changes in veterinarian policy, to stand as evidence that the dogs did in fact suffer such "distress."[19] We cannot adopt the Commonwealth's view as its requested inference is

---

[19] Dr. Southard's testimony pertaining to the effect that Michel's actions had on the dogs' bodies stands in stark difference to her complete and detailed testimony pertaining to her

- 24 -

*entirely reliant on another inference*: that by introducing evidence that practices changed surrounding euthanasia we may infer that such changes were made to fully respect the potential for companion animals to suffer *emotional* pain and suffering, and no other reason. No testimony or evidence was adduced to directly support this contention, and we therefore must treat it as "conjecture." *Yellock v. Commonwealth*, 79 Va. App. 627, 638 n.3 (2024) ("[A]n inference cannot be based upon an inference; a verdict resting upon such foundation is merely the fruit of conjecture, and cannot be sustained." (alteration in original) (quoting *Stover v. Norfolk & Western Ry. Co.*, 249 Va. 192, 200 (1995))). And the rest of the evidence adduced at trial fairs no better. The record shows that the tethering and the traveling to the scene did not physically injure the dogs, as Dr. Southard testified that the only injury she found on their bodies was the gunshot wound that instantaneously killed them. Hence, her testimony actually supports Michel's "reasonable hypothesis of innocence" that the dogs were not in pain or did not suffer otherwise, preventing his actions from being done cruelly under the meaning of the term. *Brickhouse v. Commonwealth*, 276 Va. 682, 687 (2008) (quoting *Rogers v. Commonwealth*, 242 Va. 307, 317 (1991)). Without any further support regarding what happened when Michel shot the dogs, any such inference from these facts alone does not demonstrate that Michel acted cruelly as Dr. Southard's testimony that they failed to suffer or experience pain otherwise bars us from inferring such. The Commonwealth could have eliminated any reasonable hypothesis of innocence by simply introducing evidence building from these statements. But it did not, and this is something we cannot change. Hence, under the meaning of "cruelly" as used in Code § 3.2-6570(F), the record contains insufficient evidence to prove that Michel acted cruelly when

---

testimony related to the necessity for the dogs' death, in which she noted not seeing "any reason that these animals would need to be euthanized," statements which were permitted by the Virginia Rules of Evidence. *Llamera v. Commonwealth*, 243 Va. 262, 264 (1992) (noting that an expert may "express h[er] opinion relative to the existence or nonexistence of facts not within common knowledge" (quoting *Webb v. Commonwealth*, 204 Va. 24, 33 (1963))).

he shot the dogs per that term's meaning. Thus, we are compelled to find that the Commonwealth failed to introduce sufficient evidence from which a reasonable juror could infer that Michel violated that provision, because we cannot find sufficient evidence to support the Commonwealth's contention that Michel's actions were "cruel" in that they caused pain or suffering to the dogs.

Likewise, we next find the Commonwealth failed to adduce sufficient evidence to show that Michel's conduct inflicted an inhumane injury to the dogs per the statute's plain language. The dissent, by reading the term "inhumane" to be encompassed by any harm or damage that was inflicted by a voluntary act done "without compassion, sympathy, or consideration," *Humane*, *Webster's Third New International Dictionary* (1961), advocates for the scope of the statutory text to be far broader, encompassing more nebulous conduct, particularly where the defendant's actions show a lack of compassion or consideration *regardless* of whether the animal suffers any pain or suffering as a result. We find that by its own argument over the scope of the term "inhumane," the dissent has shown "inhumane" to be in fact ambiguous in this context by demonstrating that the term "admit[s] to 'being understood in more than one way[,]' [and] refer[s] to 'two or more things simultaneously.'" *Auer v. Commonwealth*, 46 Va. App. 637, 645 (2005) (second alteration in original) (quoting *Diggs v. Commonwealth*, 6 Va. App. 300, 301-02 (1988) (en banc)); *see, e.g.*, *Blake v. Commonwealth*, 288 Va. 375, 383 (2014) (concluding that the term "send" was ambiguous as used in Code § 22.1-254(A) after examining ten dictionary definitions of the word and concluding that it could not be unambiguous as "two [of the definitions] would result in distinct interpretations of the statute"). Hence, we must employ canons of construction to resolve the ambiguity pertaining to this term's conceptual scope. *See Rasmussen v. Commonwealth*, 31 Va. App. 233, 238 (1999) (noting that "[t]he province of

[statutory] construction lies wholly within the domain of ambiguity" (second alteration in original) (quoting *Coleman v. Commonwealth*, 27 Va. App. 768, 773 (1998))).

As we are faced with ambiguity pertaining to whether Michel's conduct falls within the ambit of the term "inhumane," which modifies "injury or pain" in a list of potential conduct that constitutes a felony violation, we apply the canon of *noscitur a sociis* to determine what conduct it encompasses. *O'Banion*, 30 Va. App. at 719-20. Analyzing the dictionary definitions of "inhumane injury," the adjacent "cruelly" modifier, and its surrounding action terms, "tortures," "beats," "maims," or "mutilates," we are able to glean them all to have a "least common denominator." *Sainani*, 297 Va. at 726 (quoting Scalia & Garner, *supra*, at 196). And this factor in common is the infliction of pain and/or suffering, through a particular injurious action or inaction.

Examining the action terms for instance, "[t]orture" has been defined to encompass conduct involving "the infliction of *intense pain*."[20] *Torture*, *Webster's Third New International Dictionary* (2003); *Torture*, *Black's Law Dictionary*, *supra*. Consistent with this definition, the Supreme Court of Virginia notes that "torture" proscribes conduct that causes "physical or mental . . . agony or anguish." *Lawlor v. Commonwealth*, 285 Va. 187, 257 (2013) (quoting *West v. State*, 313 S.E.2d 67, 71 (Ga. 1984) (appendix)). The other terms pertaining to the proscribed conduct also show a similar relationship with pain and suffering quite viscerally through the injuries they describe. The term "[b]eat" involves the "strik[ing] . . . [or] hit[ting] repeatedly [of a victim] with [a hand or object] so as to *inflict pain*." *Eberhardt*, 74 Va. App. at 33 (third and fourth alterations in original) (emphasis added) (quoting *Beat*, *Webster's Third New International Dictionary* (1993)). The term "[m]aim" denotes a "type of . . . injury . . . involving

---

[20] As noted above, there is no contention that Michel tortured the dogs; as a result, these definitions are being utilized for purposes of performing the *noscitur a sociis* analysis.

a wound or injury that is both severe and permanent." *Maim*, *Black's Law Dictionary*, *supra*. "[M]utilate" is defined as "to cut off or permanently destroy a limb or essential part (of a body)" and "to cut up or alter radically so as to make imperfect." *Mutilate*, *Webster's Third New International Dictionary* (1993). And each of these terms is modified with the "cruelly" requirement as analyzed above, requiring a showing of some type and amount of "pain or suffering."[21] *Mollenhauer*, 73 Va. App. at 335.

It is true that "inhumane" can mean "not humane," *Inhumane*, *Webster's Third New International Dictionary* (2003), thus describing conduct that is devoid of "compassion, sympathy, or consideration for other human beings or animal," *Humane*, *Webster's Third New International Dictionary* (2003). But it also can mean "[e]xtremely cruel," involving "unacceptable suffering." *Inhumane*, *Black's Law Dictionary*, *supra*. Hence, the statutory language in context is essential to determining which definition applies. *Bell*, 22 Va. App. at 98. Since torture, beatings, maimings, and mutilations, each of which by their denoted nature involve the infliction of an injury, *noscitur a sociis* would require us to interpret "inhumane" similarly to mean "extremely cruel" or the infliction of "unacceptable suffering." This conclusion stems from "cruelly" being the adverb form of "cruelty" as analyzed above, which means the infliction of some pain or some suffering per *Mollenhauer*'s analysis and similar dictionary sources.[22] *See Inhumane*, *Black's Law Dictionary*, *supra*.

---

[21] Consistent with the doctrine of judicial restraint, we decline to adopt any one of these definitions that pertain to an element of the offense described in Code § 3.2-6570(A) or Code § 3.2-6570(F). *Commonwealth v. White*, 293 Va. 411, 419 (2017) (noting that "[t]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available'" (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015))). The judicially settled meaning of these terms and their conceptual scope will be decided when the elements are in question before the Court.

[22] We note that the *noscitur a sociis* canon would also preclude the dissent's interpretation of the term "cruelly" for similar reasons. Also, as a result of finding that the trial

- 28 -

It follows that we must reject the dissent's assertion that we should read "inhumane" to proscribe conduct purely based off an imputation of intent without connection to the harm suffered. Were we to do so, we would eliminate consequences envisioned by the General Assembly when choosing these specific terms and collapse the distinction between the felony and misdemeanor offenses.

To begin, the visceral nature of this selected language alone, along with the terms' relationship to pain and suffering, suggests that "inhumane" was instead selected as an amplifier to describe the drastic effect of the defendant's conduct in causing an "injury or pain" pertaining to conduct outside of torture, beatings, maimings, or mutilations. *See, e.g.*, *United States v. Snider*, 502 F.2d 645, 653 (4th Cir. 1974) (noting in analyzing the terms "false" and "fraudulent" in 26 U.S.C. § 7205 in relation to other federal criminal statutory schemes that the rule against surplusage is satisfied where context shows "it is not unlikely" that the legislature's use of similar terms in a criminal statute evokes "cumulative effect" where the terms used have an associated meaning). The interpretative gloss provided to "inhumane injury or pain" by this Court supports our intuition as this specific prohibition has been frequently applied to defendants in both the misdemeanor and felony context who engaged in grievous misconduct in caring for their companion animals causing suffering or inflicted what the Commonwealth's evidence showed was a severe and painful injury. *Ingram*, 74 Va. App. at 78; *Pelloni*, 65 Va. App. at 743-44.[23] As shown by the dissent, "inhumane" "is capable of many meanings," *McDonnell*,

court erred in interpreting Code § 3.2-6570(F), we decline to address Michel's third assignment of error pertaining to the trial court's decision to deny his proffered jury instructions. *White*, 293 Va. at 419.

[23] A review of this Court's unpublished cases further show this distinction. *Compare Reid v. Commonwealth*, No. 0413-22-3, slip op. at 2, 7-8 (Va. Ct. App. Apr. 4, 2023) (finding evidence that a dog was "completely emaciated," showed symptoms of dehydration, cardiac insufficiency, weakness, apathy, a complete lack of muscle, and heavy flea infestation, sufficient

579 U.S. at 569 (quoting *Jarecki*, 367 U.S. at 307), thus, we should choose a meaning that does not "giv[e] 'unintended breadth to the Acts of [the General Assembly],'" *Gustafson*, 513 U.S. at 575 (quoting *Jarecki*, 367 U.S. at 307). And the dissent's reading of the term "inhumane" would have that exact effect. Therefore, we find that the *noscitur a sociis* canon in conjunction with the terms adopted by the General Assembly precludes the dissent's interpretation of "inhumane."

Furthermore, we find we also cannot adopt the dissent's interpretation of the term "inhumane" as the dissent's application would render the General Assembly's differentiation between misdemeanor conduct and felony conduct under Code § 3.2-6570 largely a nullity, entirely "collapsing the distinction"[24] between the felony and misdemeanor offenses. *United States v. Melaku*, 41 F.4th 386, 402 (4th Cir. 2022) (Diaz, J., dissenting in part) (quoting *United States v. Taylor*, 596 U.S. 845, 857 (2022)). The dissent correctly applies the "elementary canon

---

to support an animal cruelty conviction for an "inhumane injury" where the Commonwealth adduced evidence showing that it would have taken months for the dog to reach such an extreme state of emaciation), *and Huffman v. Commonwealth*, No. 0797-21-3, slip op. at 2-4, 14 (Va. Ct. App. June 28, 2022) (finding evidence that a family dog had been discovered partially paralyzed in a pile of feces, urine, and trash, suffering from injuries that left its "whole back half . . . basically dead," resulting in the animal being euthanized, sufficient to support a conviction of animal cruelty as a "inhumane injury" under Code § 3.2-6570(F)), *and Hillmon v. Commonwealth*, No. 1027-21-4, slip op. at 2-3, 11 (Va. Ct. App. Apr. 4, 2023) (finding sufficient evidence to support a conviction under Code § 3.2-6570(A)(i) where the record showed that the defendant knew that her older obese dog was "visibly distressed," "hyper-breathing," with a protruding tongue and bulging eyes before she proceeded to drag it across six lanes of traffic as defendant gave false testimony at trial that provided "affirmative evidence" she was aware of her conduct), *with Evans v. Commonwealth*, No. 0809-23-3, slip op. at 4, 11-13 (Va. Ct. App. Aug. 6, 2024) (finding insufficient evidence to support a misdemeanor animal cruelty conviction under Code § 3.2-6570(A)(ii) on the grounds that the defendant "willfully inflict[ed] inhumane injury" where the record showed that the defendant punched a police dog, causing a laceration on the dog's gum, and there was no testimony that the dog needed medical attention or was in pain, nor was there a way to confirm the laceration was a result of the punches as law enforcement testified that it did not observe the dog before the incident).

[24] This interpretative principle is a subset of the rule against surplusage and a direct relative to the principle that "we do not lightly assume [that the General Assembly] adopts two separate clauses in the same law to perform the same work." *United States v. Taylor*, 596 U.S. 845, 857 (2022).

- 30 -

of construction" the rule against surplusage, which provides that we should interpret statutory provisions in such a way that "'[n]o sentence, clause or word should be construed as unmeaning or surplusage[] if a construction can be legitimately found [that] will give force to and preserve all the words of the statute.'" *King*, 148 Va. at 589-90 (quoting Black Inter. Laws 83). But in applying this rule, we find it neglects to note that meaning must be provided to "the *whole and every part of the statute* taken and compared together." *Epps v. Commonwealth*, 47 Va. App. 687, 714 (2006) (en banc) (emphasis added) (quoting *Posey v. Commonwealth*, 123 Va. 551, 553 (1918)). And as a result of focusing its attention on the terms used in the felony offense provided in Code § 3.2-6570(F), we find it fails to properly regard the language of the misdemeanor offense provided in Code § 3.2-6570(A) in its interpretation.

Under the common law, the designation of an offense as a felony denoted that it was "of a deeper and more atrocious dye; while [the designation of] smaller faults, and omissions of less consequence, [we]re comprised under the gentler name of 'misdemeanors' only." 4 William Blackstone, *Commentaries* \*5; *see also* Model Penal Code § 1.04(1)-(7) (describing the differences between felony and misdemeanor offenses by punishment). As evinced by the analysis above, Code § 3.2-6570 contains both a felony and a misdemeanor offense. These offenses are textually delineated by a difference in proscribed conduct and victim. *Compare* Code § 3.2-6570(A), *with* Code § 3.2-6570(F). Code § 3.2-6570(A) proscribes conduct that "willfully inflicts an inhumane injury or pain" to *any* animal, conduct that cruelly kills *any* animal, and conduct that unnecessarily kills *any* animal without specific note of triggering conduct such as a beating, maiming, or mutilation. Code § 3.2-6570(F) instead proscribes such willfully inflicted inhumane injuries and *cruel and unnecessary* actions undertaken by a defendant that directly result in *a companion* animal's serious injury, death, or required euthanasia.

The dissent, in finding that a "willfully inflicted inhumane injury" can be any harm or damage that was inflicted by a voluntary act done without compassion, sympathy, or consideration and applying its interpretation to these sui generis facts would eviscerate almost any prosecutorial distinction between the conduct of the offenses through its broad reading of the term "inhumane." Since the record shows that the dogs suffered an instantaneous death without "pain" or some definitive form of suffering per Dr. Southard's testimony, if this conduct were found to be "inhumane" under Code § 3.2-6570(F), it is hard to imagine a factual scenario where the prohibition against unnecessary killings provided in Code § 3.2-6570(A) could ever apply to a killing of a companion animal. Under the dissent's reading of "inhumane" in Code § 3.2-6570, as the court would be required to look into the defendant's subjective considerations in killing the animal, without considering the end effect of his actions on the animal, it would be sufficient to establish violation of Code § 3.2-6570(F) by the action of shooting a companion animal alone. Therefore, the dissent's interpretation of "inhumane" in Code § 3.2-6570(F) would in effect use the term "inhumane[ly]" to strike the words "or kill" from Code § 3.2-6570(A), causing any killing of a companion animal to rise to a felony offense as a "willfully inflict[ed] inhumane injury or pain."

If the General Assembly wanted to adopt the dissent's reading of Code § 3.2-6570 and proscribe the killing or serious injuring of companion animals as felony animal cruelty without regard to the effect of the defendant's action, it could have done so easily by providing such a ban explicitly. But it did not, and instead it provided that such unnecessary killings are specific conduct that invoke a misdemeanor violation that applies to both companion and non-companion animal victims. Hence, we honor the General Assembly's decision to provide such a distinction. *See, e.g.*, *Sekhar v. United States*, 570 U.S. 729, 738 (2013) (declining to adopt an interpretation of a statute where "it would collapse the longstanding distinction between [forms of conduct] and

- 32 -

ignore [the legislature]'s choice to penalize one but not the other"). It follows that we decline to adopt the dissent's reading of "inhumane" as it would blunt the General Assembly's particular choice of words in Code § 3.2-6570(A), "constru[ing] [them] as unmeaning or surplusage.'" *King*, 148 Va. at 589. Thus, we find that in the context of Code § 3.2-6570, "inhumane" is most synonymous with "[e]xtremely cruel" involving "unacceptable suffering," where "cruel" means the infliction of some pain or suffering.[25] *Inhumane*, *Black's Law Dictionary*, *supra.*

Applying our interpretation of the term "inhumane" to these facts, we find that the Commonwealth failed to adduce any evidence showing that such harm existed here. In terms of humanity, Dr. Southard testified that "[c]aptive bolt euthanasia," not gunshot, "is approved for [euthanizing] agriculture animals" under veterinary guidelines, while acknowledging that "for many, many years" the use of a single gunshot was a "method of euthanasia that was available for agriculture animals [and] domestic animals as well," and she provided that "this method of fatal gunshot wound that was employed" by Michel "would have been consistent with the practices that were once accepted for euthanasia of both agricultural and domestic animals." She also opined "that the established practice, or former established practices" of veterinarians "may be different than the law." We conclude that these vague statements fail to support the Commonwealth's assertions as they do not show that Michel's conduct was "inhumane" beyond a reasonable doubt, especially in light of her opinion that from Michel's conduct Caleb and Colby would have suffered "immediate and instantaneous death" and could not have endured "physical suffering."

---

[25] As we decide this case "on the best and narrowest grounds available," we decline to opine on the specific amount of pain or suffering needed to satisfy either term as we conclude that the Commonwealth failed to meet its burden in this case on these facts alone. *Swann*, 290 Va. at 196.

- 33 -

The only other evidence outside of Dr. Southard's testimony in the record that could possibly support the argument that Michel's conduct inflicted an "inhumane injury" are the statements made by Michel regarding how he tethered the two dogs together and drove to the location in question before shooting Colby in the back of the head since he was "closest to [him]," then shooting Caleb to not "give him any chance to think anything else," with no further question or context. And, in terms of other evidence, the Commonwealth only introduced a video that is not before us here that documented Michel confessing to shooting Colby, then Caleb in short succession as to not "give him any chance to think anything else." From this statement, other "reasonable hypothes[e]s of innocence" spring, such that the dogs did not suffer in opposition to the Commonwealth's asserted proof. *Brickhouse*, 276 Va. at 687 (quoting *Rogers*, 242 Va. at 317). And we find that the evidence before us fails to exclude all such possibilities from the perspective of a reasonable fact finder.

We further find the Commonwealth's other reasoning in support of the trial court's interpretation unavailing. To adopt the Commonwealth's position that these provisions only differ in the type of animal they protect would do immense "violence to the text." *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 529 (1989) (Scalia, J., concurring). Further, the General Assembly "use[d] . . . the disjunctive 'or,' rather than the conjunctive 'and'" in Code § 3.2-6570(A)(ii), which permits the misdemeanor offense to be "availabl[e]" for either cruel *or* unnecessary conduct. *Pittman*, 69 Va. App. at 636 (quoting *Leftwich*, 61 Va. App. at 428 n.2). However, with respect to Code § 3.2-6570(F), the General Assembly used "and," thereby requiring that in order to prove the felony offense, the conduct must be *both* "cruel and unnecessary." In addition, if we were to adopt the Commonwealth's argument, the "cruelly and unnecessarily beats, maims, or mutilates" and "direct result" phrases in Code § 3.2-6570(F) would be mere "surplusage." *King*, 148 Va. at 589. By choosing to fashion Code § 3.2-6570(F)

- 34 -

in a manner which provides that "beat[ing], maim[ing], or mutilat[ing]" must be done "cruelly and unnecessarily" *and* lead to "a direct result" of "serious bodily injury" or "death," the General Assembly clearly required the Commonwealth to prove a causal relationship between the conduct of the defendant and the effect of that conduct on the animal in question. And, to adopt the Commonwealth's statutory interpretation as advocated on brief would also "collaps[e] the distinction" between the felony and misdemeanor offenses similar to the dissent's position. *Melaku*, 41 F.4th at 402 (Diaz, J., dissenting in part) (quoting *Taylor*, 596 U.S. at 857). Thus, we reject the Commonwealth's argument.

Lastly, the ruling of the trial court analogizing Code § 3.2-6570 to "drug statutes" that "enhance[] the culpability" of the defendant in certain attendant circumstances is also unavailing, as the statutory schemes in question are unrelated for purposes of applying a similar interpretation through the in pari materia doctrine. Drug possession and animal cruelty are not "closely connected subjects." *Prillaman*, 199 Va. at 405. For example, the actus reus of a drug possession offense is the "intentional[] and conscious[]" possession of a controlled substance. *Robbs v. Commonwealth*, 211 Va. 153, 156 (1970). The actus reus of the Code § 3.2-6570(F) animal cruelty offense is the torturing, beating, maiming, or mutilating of an animal, or the inflicting of inhumane injuries to an animal. Thus, neither of these statutory schemes "have the same general or common purpose or are parts of the same general plan," defeating the trial court's invocation of the similar treatment compelled by the in pari materia doctrine. *Prillaman*, 199 Va. at 405. Therefore, we conclude that the trial court erred in interpreting Code § 3.2-6570 in light of the Commonwealth's other arguments.

### III. CONCLUSION

For the foregoing reasons, we find that the trial court erred in interpreting Code § 3.2-6570(F). Since the Commonwealth's evidence affirmatively proved that the dogs did not

suffer any pain or suffering as a direct result of Michel's actions, the Commonwealth failed to

prove that Michel acted cruelly or inflicted an inhumane injury, and as such, the Commonwealth

failed to meet its burden. Thus, the judgment of the trial court is reversed.[26]

*Reversed.*

---

[26] As there is insufficient evidence to uphold Michel's felony convictions, he cannot be retried on those offenses. So, we do not remand for a new trial. But despite Michel's repeated requests for the charge to be amended to a misdemeanor or have a misdemeanor violation of animal cruelty presented to the jury, the record does not show that the jury was instructed as such or that Michel was in jeopardy of being convicted of misdemeanor animal cruelty. Therefore, we make no determination as to whether a misdemeanor violation of Code § 3.2-6570(A) is a lesser-included offense of Code § 3.2-6570(F), as we decide cases on the "best and narrowest grounds available." *White*, 293 Va. at 419 (quoting *Swann*, 290 Va. at 196).

Frucci, J., dissenting.

Though Michel does not assign error to a finding that he acted cruelly and unnecessarily, the majority mistakenly relies on a finding of insufficient evidence that Michel acted "cruelly," and, therefore, concludes incorrectly that the evidence does not support his convictions.[27] Furthermore, the majority's opinion would also require the conclusion that the trial court erred in interpreting Code § 3.2-6570(F) in a manner that did not preclude any and all acts that result in an instant death of a companion animal from being punishable under the subsection. Despite an excellent opinion, I respectfully disagree with my colleagues, and, for the following reasons, I would find that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Therefore, I respectfully dissent.

<u>Sufficiency of the Evidence and Michel's Motion to Strike</u>

Code § 3.2-6570(A), in pertinent part, states that "[a]ny person who . . . tortures any animal, willfully inflicts inhumane injury or pain not connected with bona fide scientific or

---

[27] On appeal, Michel brought forward three assignments of error: (1) "[t]he evidence was insufficient to convict Michel for violating Virginia Code § 3.2-6570(F)"; (2) "[t]he trial court erred in failing to grant Michel's Motions to Strike and in construing Virginia Code § 3.2-6570 when it ignored the statute's plain language which makes killing an animal a misdemeanor under Subsection A of the Statute and only imposes the harsher felony penalty under Subsection F for serious injury which results in death"; and (3) "[t]he trial court erred in refusing to instruct the jury on the misdemeanor offense of killing an animal and Michel's mental health related defense." However, in providing his legal argument and authority, Michel combined the first two assignments of error, arguing solely that: (1) the trial court did not recognize a distinction between the words "kill" and "maim" as used in Code § 3.2-6570; (2) Code § 3.2-6570(F) using the term "serious bodily injury" and not using the word "kill" prevents instant deaths from being punishable under Code § 3.2-6570(F); and (3) the words "animal" and "companion animal" as used in Code § 3.2-6570 are ambiguous. He did not provide any argument or legal authority on a basis that his actions were not cruel or unnecessary. An opening brief must contain "[t]he standard of review and the argument (including principles of law and authorities) relating to each assignment of error." Rule 5A:20(e). "Unsupported assertions of error 'do not merit appellate consideration.'" *Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017) (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008)). Furthermore, this Court is "limited to reviewing the assignments of error presented by the litigant." *Banks v. Commonwealth*, 67 Va. App. 273, 289 (2017); *see also* Rule 5A:20(c)(2).

- 37 -

medical experimentation on any animal, or cruelly or unnecessarily beats, maims, mutilates, or

kills any animal . . . is guilty of a Class 1 misdemeanor." In comparison, Code § 3.2-6570(F)

states in pertinent part:

> Any person who (i) tortures, *willfully inflicts inhumane injury or pain* not connected with bona fide scientific or medical experimentation, *or cruelly and unnecessarily beats, maims, or mutilates* any dog or cat that is a companion animal whether belonging to him or another *and* (ii) *as a direct result* causes serious bodily injury to such dog or cat that is a companion animal, *the death of such dog* or cat that is a companion animal, or the euthanasia of such animal on the recommendation of a licensed veterinarian upon determination that such euthanasia was necessary due to the condition of the animal is guilty of a Class 6 felony.

(Emphases added). Importantly, unlike Code § 3.2-6570(A)(ii), Code § 3.2-6570(F)(ii) includes

"direct[ly] result[s] . . . [in] the death" as a potential third element and does not use the word

"kill." *Compare* Code § 3.2-6570(A)(ii), *with* Code § 3.2-6570(F)(ii). Michel argues that this

difference in the sections' language means that acts that result in immediate deaths are only

punishable by Code § 3.2-6570(A) and not by Code § 3.2-6570(F), thus causing the evidence to

be insufficient to support his convictions. Though the majority opinion correctly notes that there

is no "temporal" requirement pertaining to offenses under Code § 3.2-6570(F), it agrees with

Michel. Furthermore, by inconsistently applying general principles of statutory interpretation,

the majority opinion decided that the evidence was insufficient to support Michel's convictions.

The majority's analysis is flawed as to both convictions of felony animal cruelty.

Looking at the language of Code § 3.2-6570(F), it is clear that to obtain a felony

conviction for animal cruelty, the Commonwealth must prove the defendant: (1) *either* (i)

"torture[d]," (ii) "willfully inflict[ed] inhumane injury or pain," *or* (iii) "cruelly and

unnecessarily beat[], maim[ed], or mutilate[d]"; (2) a "dog or cat that is a companion animal";

and (3) "as a direct result cause[d]" *either* (i) "serious bodily injury to such dog or cat," (ii) "the

- 38 -

death of such dog or cat," *or* (iii) "the [necessary] euthanasia of such animal." Code § 3.2-6570(F).[28]  Specifically in this case, the language in the jury instructions allowed the jury to find Michel guilty if they found beyond a reasonable doubt that Michel: (1) "[w]illfully inflicted inhumane injury or pain on a dog, or . . . [c]ruelly and unnecessarily maimed or mutilated a dog, and (2) [a]s a direct result of the defendant's action caused the death of a dog, and (3) [t]he dog is a companion animal whether belonging to him or another."

As the majority correctly points out, "[t]he term 'companion animal' is defined [for this purpose] as 'any domestic or feral dog . . . or any animal under the care, custody, or ownership of a person.'" *Pelloni v. Commonwealth*, 65 Va. App. 733, 738 (2016) (third alteration in original) (quoting Code § 3.2-6500).[29]  Applying that to the case at hand, the evidence showed that Michel

---

[28] It is apparent that the General Assembly's "use of the disjunctive word 'or,' rather than the conjunctive 'and,' [is to] signif[y] the availability of alternative choices." *Pittman v. Commonwealth*, 69 Va. App. 632, 636 (2019) (quoting *Leftwich v. Commonwealth*, 61 Va. App. 422, 428 n.2 (2013); *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012) ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives."). As such, by using the word "or," it is clear that the General Assembly intended for the first element of Code § 3.2-6570(F) to be *either* "tortures" *or* "willfully inflicts inhumane injury or pain" *or* "cruelly and unnecessarily beats, maims, or mutilates." *See Huffman v. Commonwealth*, No. 0797-21-3, slip op. at 6 n.4, 2022 Va. App. LEXIS 262, *8 n.4 (June 28, 2022).

[29] In his filed motion to vacate in the trial court, Michel claimed it was undisputed that Colby and Caleb were companion animals, but on appeal Michel argues that the term "companion animal" is ambiguous because dogs can both fall under its definition and the definition of the word "animal" as used in Code § 3.2-6570(A). *See* Code § 3.2-6500 (defining "animal" as "any nonhuman vertebrate species including fish except those fish captured and killed or disposed of in a reasonable and customary manner"). Even if this Court were to ignore his inconsistency, it is "[o]nly when a 'penal statute is unclear' do courts apply the rule of lenity and strictly construe the statute in the criminal defendant's favor." *De'Armond v. Commonwealth*, 51 Va. App. 26, 34 (2007) (emphasis omitted) (quoting *Waldrop v. Commonwealth*, 255 Va. 210, 214 (1998)). "If a statute is not ambiguous, however, 'the rule of lenity is not applicable to guide statutory interpretation.'" *Paduano v. Commonwealth*, 64 Va. App. 173, 182 (2014) (quoting *De'Armond*, 51 Va. App. at 34). Therefore, "we construe the language according to its plain meaning without resort to rules of statutory interpretation." *Holsapple v. Commonwealth*, 266 Va. 593, 598 (2003). Code § 3.2-6500 provides clear definitions for both animal and companion animal. As such, the uses of the terms in Code

and his wife jointly owned the Labrador Retrievers, Colby and Caleb, and that Michel was in part responsible for the care and custody of the dogs. As such, it is clear that there was evidence to support the jury finding that Colby and Caleb were dogs that were companion animals as used in Code § 3.2-6570(F). Furthermore, Michel admitted to shooting Colby and Caleb, and the Commonwealth presented an expert who opined that Colby and Caleb's deaths were the result of being shot in the back of the head and that there was no reason they would have needed to be euthanized. Therefore, it is also clear that there was sufficient evidence to support the jury finding that Colby and Caleb died as a direct result of Michel's actions.

Turning towards the third essential element, to find Michel guilty of felony animal cruelty, the jury had to find beyond a reasonable doubt that *either* (1) Michel willfully inflicted inhumane injury or pain *or* (2) he cruelly and unnecessarily maimed or mutilated Colby and Caleb. Looking at willfully inflicted inhumane injury or pain, "[t]he Commonwealth can establish that a defendant willfully inflicted inhumane injury [or pain] on an animal if it can present evidence that the defendant 'voluntarily acted with a consciousness that "inhumane injury or pain" would result.'" *Blankenship v. Commonwealth*, 71 Va. App. 608, 624 (2020) (quoting *Pelloni*, 65 Va. App. at 743).[30] Code § 3.2-6570(F) does not provide a definition for what constitutes "inhumane injury or pain." In defining it, "[w]e must determine the General Assembly's intent from the words appearing in the statute, unless a literal construction of the statute would yield an absurd result." *Pelloni*, 65 Va. App. at 739 (quoting *Schwartz v. Commonwealth*, 45 Va. App. 407, 450 (2005)). "[W]e examine a statute in its entirety, rather

---

§ 3.2-6570 are unambiguous, and the majority opinion correctly applies the plain meaning of the term "companion animal."

[30] "A voluntary act becomes willful, in law, only when it involves conscious wrong or evil purpose on the part of the actor, or at least inexcusable carelessness, whether the act is right or wrong." *Willful*, *Black's Law Dictionary* (12th ed. 2024).

than by isolating particular words or phrases.  When the language in a statute is clear and unambiguous, we are bound by the plain meaning of that language."  *Schwartz*, 45 Va. App. at 450 (quoting *Cummings v. Fulghum*, 261 Va. 73, 77 (2001)).  "When interpreting and applying a statute, [courts] assume that the General Assembly chose, with care, the words it used in enacting the statute."  *City of Richmond v. Va. Elec. & Power Co.*, 292 Va. 70, 75 (2016) (alteration in original) (quoting *Kiser v. A.W. Chesterton Co.*, 285 Va. 12, 19 n.2 (2013)).  Furthermore, "[w]hen the General Assembly has used specific language in one instance, but omits that language or uses different language when addressing a similar subject elsewhere in the Code, we must presume that the difference in the choice of language was intentional."  *Id.* (quoting *Zinone v. Lee's Crossing Homeowners Ass'n*, 282 Va. 330, 337 (2011)).

As such, it must be noted that while the definition of "inhumane injury" is not provided, Code § 3.2-6570(F) does provide a definition for what constitutes "serious bodily injury."  By providing a definition for "serious bodily injury," it can be determined that an "inhumane injury" is different than a "bodily injury that involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty."[31]  Code § 3.2-6570(F).  *See Huffman v. Commonwealth*, No. 0797-21-3, slip op. at 12, 2022 Va. App. LEXIS 262, at *16 (June 28,

---

[31] Notably, Michel's assignment of error specifically claims that Code § 3.2-6570 "only imposes the harsher felony penalty under Subsection F for serious injury which results in death." For the reasons stated in the dissent above, "serious bodily injury" is a separate term from "inhumane injury," and therefore, it is interpreted to have different meanings.  Additionally, stating Code § 3.2-6570(F) requires "serious injury which results in death" conflicts with the elements of the statute.  The Commonwealth does not have to prove a "serious injury which results in death," rather the Commonwealth has to prove the defendant either: (1) (i) "torture[d]," (ii) "*willfully inflict[ed] inhumane injury or pain*," *or* (iii) "cruelly and unnecessarily beat[], maim[ed], or mutilate[d]"; (2) a "companion animal"; and (3) "as a direct result cause[d]" *either* (i) "*serious bodily injury* to such dog or cat," (ii) "*the death* of such dog or cat," *or* (iii) "the [necessary] euthanasia of such animal."  Code § 3.2-6570(F) (emphases added).  As such, the question is not whether a serious injury resulted in death but whether a willful infliction of inhumane injury resulted in a serious bodily injury *or* death.

- 41 -

2022) ("We believe that the term 'inhumane' was employed to distinguish cases in which an animal suffers serious bodily injury, where the infliction itself was not 'inhumane' or without consideration for the animal.").

Additionally, when looking at the plain meaning[32] of the statute, inhumane means "not humane." *Inhumane*, *Webster's Third New International Dictionary* (1961). "Humane" means "marked by compassion, sympathy, or consideration for other human beings or animals." *Humane*, *Webster's Third New International Dictionary*, *supra*. Injury is defined as "[a]ny harm or damage." *Injury*, *Black's Law Dictionary* (12th ed. 2024). Therefore, a "willfully inflict[ed] inhumane injury" can be any harm or damage that was inflicted by a voluntary act done without compassion, sympathy, or consideration. *See, e.g.*, *Huffman*, slip op. at 12, 2022 Va. App. LEXIS 262, at *16 (defining inhumane injury to an animal to be that which was inflicted inhumanely or without consideration for the animal). When a healthy dog is shot in the back of the head, the dog suffers the harm of having its skin ripped apart, its skull split open, and part of its head permanently destroyed.[33] As such, I would find that an inconsiderate or

---

[32] In interpreting statutes, we "apply the plain meaning of the language appearing in the statute unless it is ambiguous or applying the plain language leads to an absurd result." *Commonwealth v. Amos*, 287 Va. 301, 305-06 (2014).

[33] The majority opinion implies a weakness in the Commonwealth's case because Dr. Southard's expert opinion did not include that the harm to Colby and Caleb was inhumane. However, this ignores that "an expert witness 'cannot give [her] opinion upon the precise or ultimate fact in issue, which must be left to the jury or the court trying the case without a jury for determination.'" *Justiss v. Commonwealth*, 61 Va. App. 261, 273 (2012) (quoting *Llamera v. Commonwealth*, 243 Va. 262, 264 (1992)). Therefore, to imply that the Commonwealth's case is weakened simply by its following of the rules of evidence is an incorrect and unfair inference. Simply put, it is for the jury to decide whether the willful infliction of the harm or injury was inhumane or whether the dogs were unnecessarily and cruelly mutilated, which they found occurred in this case.

uncompassionate shooting of a dog causes an inhumane injury.[34]  Importantly, this does not

require that the animal suffered for a certain period or that death was not instant[35]; to say

otherwise would require the court to impermissibly add words to Code § 3.2-6570(F) or alter it

past its plain meaning.  *See Haefele v. Commonwealth*, 75 Va. App. 591, 600 (2022).  It does not

take an act of imagination or mental gymnastics to contemplate a rational trier of fact finding that

the facts in this case, to include the cold-blooded binding and execution of two otherwise healthy

companion animals, amounted to a willful infliction of an injury and done so in a manner devoid

of humanity; indeed, the acts could be considered the antithesis of the word "humane."

　　To combat this conclusion, while also simultaneously finding the statutes' sections at

issue are unambiguous and agreeing that "inhumane" means "not humane" and that "humane"

means "marked by compassion, sympathy, or consideration for other human beings or animals,"

the majority opinion labels the word "inhumane" as ambiguous.  Though I would find that the

word inhumane is unambiguous,[36] the majority opinion's limitation of "inhumane" ignores the

---

[34] While *Blankenship* and *Pelloni* did not define "willfully inflicts inhumane injury or pain," this definition would be consistent with their findings of a willful infliction of inhumane injury or pain.  *See Blankenship*, 71 Va. App. at 624 (finding the willful infliction of inhumane injury or pain where a defendant punched and kicked a police K-9); *Pelloni*, 65 Va. App. at 743-44 (finding the willful infliction of inhumane injury or pain where a defendant allowed a dog to slowly starve to death); s*ee also Glenn v. Commonwealth*, No. 1626-22-3, slip op. at 8, 2023 Va. App. LEXIS 718, *12 (Oct. 24, 2023) (finding the evidence sufficient where a defendant shot a dog in his yard).

[35] In addition to it not being necessary under "willful[] inflict[ion] [of] inhumane injury," it is also not necessary for the directly caused death elements of Code § 3.2-6570(F).  The plain meaning of death is "[t]he ending of life; the cessation of all vital functions and signs." *Death*, *Black's Law Dictionary*, *supra*.  As such, the plain language of Code § 3.2-6570(F) shows that it does not require a "later death" or a "prolonged death," rather it just requires that life ends as a direct result of the defendant committing one of the prohibited acts.

[36] The majority's conclusion (although inconsistent at times) that "inhumane" is ambiguous is further flawed since the additional conduct the majority opinion includes as a separate definition can actually be encompassed in acts that are done without compassion, sympathy, or consideration, the word "inhumane" is not being internally inconsistent or

clear intentions of the General Assembly, renders the word "cruelly" as surplus, and conflates the elements of Code § 3.2-6570. "A cardinal rule of statutory construction is that a statute be construed from its four corners and not by singling out a particular word or phrase." *Commonwealth Nat. Res., Inc. v. Commonwealth*, 219 Va. 529, 536 (1978). "[E]very part of a statute is presumed to have some effect and no part will be considered meaningless unless absolutely necessary." *Hubbard v. Henrico Ltd. P'ship*, 255 Va. 335, 340 (1998). As stated earlier, courts assume the General Assembly chose its words with care and presume that the choice to use specific language in one instance but omit the language or use different language elsewhere when addressing a similar subject was intentional. *Va. Elec. & Power Co.*, 292 Va. at 75. Therefore, we must conclude that the definition of "willful[] inflict[ion] [of an] inhumane injury" is different than "cruelly . . . beat[ing], maim[ing], or mutilat[ing]" and that an "inhumane injury" is different than a "serious bodily injury."[37] Code § 3.2-6570(F)(i). Furthermore, the General Assembly did not include the animal feeling pain or suffering as an

---

incapable of operation, and the common sense definition of "inhumane" allows for all parts of Code § 3.2-6570 to have a distinct meaning whereas the majority opinion leads to the word "cruelly" to be surplus (as evident by finding the evidence insufficient because of their conclusion that Michel didn't act cruelly).

[37] The majority opinion claims the canon of *noscitur a sociis* supports its conclusion and claims it is limiting "inhumane injury" by the meaning of the words "tortures, "beats," "maims," and "mutilates." While this ignores the fact that the General Assembly did not group them all together, the majority opinion's limiting of "inhumane" in this manner is also dependent upon taking the definition of those words past their plain meanings. *See, e.g.*, *Mutilate*, *Black's Law Dictionary*, *supra* (defining "mutilate" as "[t]o severely and violently damage; esp., to cut off or cut out an essential part of; to maim or cripple"); *Maim*, *Black's Law Dictionary*, *supra* (defining "maim" as a "type of strength-diminishing injury required to support a charge of mayhem, . . . involving a wound or injury that is both severe and permanent; esp., serious injury to a body part that is necessary for fighting or defending oneself"). While pain and suffering may result from a maiming or mutilation, the definitions, as stated in the majority, do not require a finding of pain or suffering. For example, a bullet ripping apart skin, cracking and demolishing parts of a skull will permanently destroy "[an] essential part" of a dog. *Mutilate*, *Black's Law Dictionary*, *supra*. Without any thought about pain or suffering occurring as a result, a mutilation would have occurred. Therefore, even under the reasons of the majority opinion, it would be adding words to the statute to say a period of pain or suffering is required.

element of felony animal cruelty.[38]  Regardless of these facts, the majority opinion would require

"inhumane" to be limited to only inhumane acts that are cruel and result in pain or suffering.  To

apply the findings of the majority opinion would require one to ignore that the General Assembly

omitted the word cruelly when laying forth the "willful[] inflict[ion] [of] inhumane injury or

pain" but purposely used it when describing an alternative theory in both Code § 3.2-6570(F) and

Code § 3.2-6570(A); one would also have to disregard that the General Assembly defined a

completely different term to include an injury of extreme pain.[39]  Furthermore, in limiting a

theory by the requirements of an alternative theory, the majority opinion takes an unambiguous

statute unnecessarily beyond its plain meaning, directly contradicts the intent of the General

Assembly, removes the distinct meaning of the different theories, and generally creates a

dangerous precedent allowing alternative theories in statutes to be conflated together.[40]  As a

---

[38] The General Assembly did, however, include extreme pain as part of the definition of "serious bodily injury," which indicates that they knew how to use "pain" to limit the statute when so desired.

[39] The majority opinion also disregards that the sentence structure of Code § 3.2-6570 shows the General Assembly's intent for "willfully" to be the intent element behind "willfully inflicts inhumane injury or pain" and "cruelly and unnecessarily" to be that for "cruelly and unnecessarily beats, maims, or mutilates."  Therefore, similarly to how the above dissenting opinion describes the necessity to determine if the defendant willfully inflicted an inhumane injury, the question under "cruelly and unnecessarily beats, maims, or mutilates" would be if he had a cruel and unnecessary intent when beating, maiming, or mutilating the animal.  As such, even under that theory, it is not a matter of the animal feeling pain or suffering for a period of time, but whether the defendant unnecessarily intended for the animal to feel pain or suffer.

[40] Though the majority points out a flaw in the Commonwealth's argument on the difference between Code § 3.2-6570(A) and Code § 3.2-6570(F) by pointing out that Code § 3.2-6570(F) provides for a connection between the conduct of the defendant and the effect of that conduct on the animal, it fails to see how it conflates what is prohibited conduct with what is a required effect from that conduct throughout its opinion.  For example, though the statute clearly prohibits the conduct of "willfully inflict[ing] inhumane injury or pain," the majority opinion declares that the word "inhumane" is a mere "amplifier to describe the drastic effect of the defendant's conduct."  The majority's intermingling of separate elements of the statute is not without consequence, as is evident by its assertions made throughout the opinion that would add requirements nowhere in the statute.

commonsense meaning of the word "inhumane" does not make it necessary for the Court to essentially render part of the statute meaningless and ignore the differences in the language the General Assembly chose to use, the Court should not go beyond the commonsense meaning of the words or seek to limit the statute beyond what is proved by the General Assembly's intentional word choice.

As demonstrable when one does not conflate theories and gives meaning to the entire statute, Code § 3.2-6570(F) is unambiguous, contains no temporal requirement, and an inhumane instant killing can fall under it.[41] As such, the trial court did not err in finding the statute unambiguous and in denying Michel's motion to strike, in which he argued forbidden actions resulting in immediate deaths are only ever punishable by Code § 3.2-6570(A).

Overall, the evidence presented to the jury demonstrated how Michel armed himself with a nine-millimeter firearm and proceeded to take Colby and Caleb to a desolate, wooded area. There, he tethered them together and executed them one by one. As Colby was nearest, Michel shot him first in the back of the head while he was connected to Caleb. Then, he similarly shot Caleb in the back of the head. In doing so, he caused both dogs to have their skin ripped apart, skulls split open, and portions of their heads permanently destroyed. As a result of this act, both dogs died. He then used leaves to hide their deceased bodies and left them in the desolate, wooded area. Colby and Caleb were both young healthy dogs who had no reason to be euthanized. When asked why he killed them, Michel said he did it to "save his marriage," an

---

[41] Contrary to the majority's assertions, concluding that Code § 3.2-6570(F) can encompass inhumane instant killings does not render the use of "cruelly or unnecessarily . . . kill" in Code § 3.2-6570(A) meaningless. Though the majority opinion often conflates the words "cruelly" and "inhumane" and labels the word "cruelly" a "modifier," they are distinct words that the General Assembly has chosen to use in two different alternative theories. By considering each intentionally used word's distinct purpose and meaning, it does not take a stretch of the imagination to contemplate how some "unnecessary" killings can be conducted without the consciousness that the act will result in an inhumane injury or pain.

explanation that was in no way considerate of the wellbeing of Colby and Caleb. The evidence presented was more than sufficient to show that Michel acted voluntarily with a consciousness that an inhumane injury would occur.[42] As a rational trier of fact could have found beyond a reasonable doubt that Michel violated Code § 3.2-6570(F), his convictions should be affirmed. *See Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016).[43] Furthermore, as there is no temporal requirement under Code § 3.2-6570(F), the trial court did not err for interpreting Code § 3.2-6570(F) in a manner that did not preclude all manners of instant deaths. As Michel did not assign error to any finding that he acted cruelly and unnecessarily, and doing so would be

---

[42] The majority opinion finds that the Commonwealth did not exclude all reasonable hypotheses of innocence. However, "[t]he Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant." *Simon v. Commonwealth*, 58 Va. App. 194, 206 (2011) (quoting *Hamilton v. Commonwealth*, 16 Va. App. 751, 755 (1993)). Furthermore, we are required to review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Konadu v. Commonwealth*, 79 Va. App. 606, 610 n.1 (2024) (quoting *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Id.* (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, for the reasons stated above, the evidence more than sufficiently supported a conviction and excluded the *reasonable* theories of innocence.

[43] "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez*, 291 Va. at 248 (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

unnecessary, I would decline to conduct an analysis beyond that of his assignments of error and would affirm the trial court's denial of his motion to strike for these reasons alone.[44]

Jury Instructions

The majority opinion does not address Michel's argument that the trial court erred in rejecting his proposed jury instructions that would have provided the jury with the option of finding him guilty of "killing an animal" and his proposed instruction that he claims went to his "mental health related defense." As I reach a different conclusion in regard to the sufficiency of the evidence and motion to strike arguments, addressing this assignment of error would be necessary in determining whether the trial court committed a reversible error.

When analyzing a trial court's rejection of a jury instruction, "we view the evidence in the light most favorable to the proponent of the instruction." *Commonwealth v. Vaughn*, 263 Va. 31, 33 (2002). Jury instructions are proper "only on those theories of the case that are supported by [more than a scintilla of] evidence.'" *Eaton v. Commonwealth*, 240 Va. 236, 255 (1990) (quoting *Frye v. Commonwealth*, 231 Va. 370, 388 (1986)). *See Orbe v. Commonwealth*, 258 Va. 390, 398 (1999). "The purpose of jury instructions 'is to fully and fairly inform the jury as to the law of the case applicable to the particular facts, and not to confuse them.'" *Honsinger v.*

---

[44] The majority claims support for its conclusion comes from the opinion of *Mollenhauer v. Commonwealth*, 73 Va. App. 318, 335 (2021). In *Mollenhauer*, the evidence was held to be sufficient to convict the defendant of child cruelty under Code § 40.1-103. *Id.* at 338. As this Court stated, "Code § 40.1-103, provide[d] in pertinent part that '[i]t shall be unlawful for any person . . . having the custody of any child . . . to cause or permit such child to be . . . tortured . . . or cruelly treated.'" *Id.* at 334 (all alterations but first in original) (quoting Code § 40.1-103). For this reason, in reaching its conclusion, this Court in *Mollenhauer* interpreted the word "cruelly" in the context of whether a victim had been "cruelly treated" rather than in the context of whether the defendant acted "cruelly." *Id. Compare* Code § 40.1-103 (providing that the child had been cruelly treated), *with* Code § 3.2-6570(F) (providing that the defendant "cruelly and unnecessarily beat[], maim[ed], or mutilat[ed]"). As Code § 3.2-6570(F) uses the word "cruelly" in the context of the mental state of the defendant in committing a prohibited act rather than as an adjective of the victim's injury, it is distinguishable from Code § 40.1-103. As such, I would disagree with the majority's application of *Mollenhauer*.

- 48 -

*Egan*, 266 Va. 269, 274 (2003) (quoting *H.W. Miller Trucking Co. v. Flood*, 203 Va. 934, 936 (1962)). "We review jury instructions 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Lawlor v. Commonwealth*, 285 Va. 187, 228 (2013) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). "This is a mixed question of law and fact. It is error to give an instruction that incorrectly states the law; 'whether a jury instruction accurately states the relevant law is a question of law that we review de novo.'" *Id.* (quoting *Orthopedic & Sports Physical Therapy Assocs., Inc. v. Summit Grp. Props., LLC*, 283 Va. 777, 782 (2012)). Furthermore, unless materially vital to the defendant, "when a proffered instruction is not a correct statement of the law or is not supported by the evidence in the case, the trial court is not required to correct or amend the instruction rather than refusing to grant it." *Honsinger*, 266 Va. at 275.

In the case at hand, the trial court refused four of Michel's proposed jury instructions. The first one was Instruction A, which stated:

> The defendant is charged with the crime of cruelty to an animal. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
>
> (1) That the defendant willfully maimed a dog; and
> (2) The dog was a companion animal; and
> (3) That the maiming caused a serious bodily injury to the dog;
> (4) That the serious bodily injury resulted in death of the dog; and
> (5) That the defendant's conduct was cruel and unnecessary;
>
> If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the above elements of the crime as charged, then you shall find the defendant guilty of animal cruelty.
>
> If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt that the defendant cruelly or unnecessarily killed an animal, you should find the defendant guilty of killing an animal.

> If you find that the Commonwealth has failed to prove beyond a reasonable doubt any one or more of the first four elements of the crime, then you shall find the defendant not guilty.
>
> You shall not reach your decision as to the elements of this offense until you have considered each and every instruction of this Court.

The proposed Instruction A is problematic for several reasons. First, as previously stated, it is clear that the General Assembly's "use of the disjunctive word 'or,' rather than the conjunctive 'and,' [is to] signif[y] the availability of alternative choices." *Pittman v. Commonwealth*, 69 Va. App. 632, 636 (2019) (quoting *Leftwich v. Commonwealth*, 61 Va. App. 422, 428 n.2 (2013)); *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012) ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives."). So, by using the word "or," it is apparent that the General Assembly intended for the first element of Code § 3.2-6570(F) to be *either* "tortures" *or* "willfully inflicts inhumane injury or pain" *or* "cruelly and unnecessarily beats, maims, or mutilates." *See Huffman*, slip op. at 6 n.4, 2022 Va. App. LEXIS 262, at *8 n.4. As such, by proposing to instruct the jury to determine if the "defendant willfully maimed a dog," the instruction ignores that "willfully inflicts inhumane injury or pain" is a distinct alternative to "cruelly and unnecessarily beats, maims, or mutilates," and adds an additional requirement to "cruelly and unnecessarily beats, maims, or mutilates."

Secondly, instructing the jury to determine if "the maiming caused a serious bodily injury to the dog" and if "the serious bodily injury resulted in death of the dog" also misconstrues Code § 3.2-6570(F). The Commonwealth does not have to prove a "serious bodily injury result[ing] in death," rather the Commonwealth has to prove the defendant either: (1) (i) "torture[d]," (ii) "willfully inflict[ed] inhumane injury or pain," or (iii) "cruelly and unnecessarily beat[], maim[ed], or mutilate[d]"; (2) a "companion animal"; and (3) "as a direct result cause[d]" *either*

- 50 -

(i) "*serious bodily injury* to such dog or cat," (ii) "*the death* of such dog or cat," *or* (iii) "the [necessary] euthanasia of such animal." Code § 3.2-6570(F) (emphases added). As such, the question is not whether a serious injury resulted in death but whether a nonpermitted action by the defendant resulted in a serious bodily injury *or* death *or* euthanasia.

Lastly, Instruction A would be confusing to the jury. Michel claims these jury instructions were meant to allow the jury to have the option to find him guilty of what he claims to be a "lesser-included offense" (specifically, he wanted the jury to be able to find him guilty of violating Code § 3.2-6570(A) instead of Code § 3.2-6570(F)). However, rather than attempt to provide a jury instruction that would instruct the jury on the elements of Code § 3.2-6570(A), he instead provided a jury instruction that intermingled parts of Code § 3.2-6570(F) and then stated "[i]f you find from the evidence that the Commonwealth has proved beyond a reasonable doubt that the defendant cruelly or unnecessarily killed an animal, you should find the defendant guilty of killing an animal." As detailed previously, "kill" means "[t]o end life; to cause physical death." *Kill*, *Black's Law Dictionary*, *supra*. As such, when an instruction has a previous requirement that the jury determine if something "resulted in death," they could reasonably be confused when there is no instruction on why "resulted in death" is not the same as "killed." Overall, Instruction A does not accurately state the law and is likely to confuse the jury. *Honsinger*, 266 Va. at 274. Therefore, the trial court did not err in refusing the instruction.

The second rejected instruction was Instruction B. Instruction B was the same as Instruction A. Therefore, for the same reasons stated for Instruction A, the trial court did not err in refusing Instruction B.

The third rejected instruction was Instruction C, which stated:

> You have been instructed on more than one grade of animal cruelty. If you have a reasonable doubt as to the grade of the offense, then you must resolve that doubt in favor of the defendant and find him guilty of the lesser offense.

> For example, if you have a reasonable doubt as to whether he is guilty of cruelty to an animal or killing an animal, you shall find him guilty of the lesser offense of killing an animal.
>
> If you have a reasonable doubt as to whether he is guilty at all, you shall find him not guilty.

Even if this Court were to find no problem in how Instruction C is constructed, without an instruction on another "grade of offense" or "lesser offense," this instruction would only confuse the jury. Notably, the Supreme Court of Virginia has "rejected the concept that a jury instruction on the lesser-included offense must always be given." *Vaughn*, 263 Va. at 35 (citing *Guss v. Commonwealth*, 217 Va. 13, 14 (1976)). Instead, the evidence must "provide the necessary quantum of independent evidence" to support an instruction on the lesser-included offense. *Commonwealth v. Leal*, 265 Va. 142, 147 (2003). So, "[i]f the evidence is sufficient to support 'a conviction of the crime charged, and there is no independent evidence warranting a conviction [of the lesser-included offense], an instruction on the lesser-included offense need not be given.'" *Vaughn*, 263 Va. at 36 (second alteration in original) (quoting *Guss*, 217 Va. at 14). Furthermore, the jury's "ability to reject evidence does not supply the affirmative evidence necessary to support a jury instruction." *Id.* at 37. As Michel did not provide an instruction that actually instructed the jury on a lesser-included offense, the trial court did not err in rejecting Instruction C. Additionally, because I would find that the evidence was sufficient to support a conviction of the crimes charged, I would also affirm the trial court rejecting Instruction C because Michel would not be entitled to any instruction of a lesser-included offense.[45]

---

[45] As a result of finding that Michel would not be entitled to an instruction regardless, I would decline to address the issue of whether Code § 3.2-6570(A) is in fact a lesser-included offense of Code § 3.2-6570(F). *See Ali v. Commonwealth*, 75 Va. App. 16, 37 n.9 (2022) (noting that "[t]he mechanism of assuming without deciding a particular point in issue sometimes facilitates the appellate court's achievement of th[e] goal" of "decid[ing] cases on the best and narrowest ground"); *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) (stating that "the doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available'" (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017))).

The final rejected instruction was Instruction D, which stated:

> You have heard evidence of the defendant's mental illness. You are to consider that evidence only in determining whether the defendant had the intent required at the time the alleged crime was committed. If, after considering all the evidence, you have reasonable doubt the defendant possessed the intent required for the crime charged or a lesser-included offense, you shall find the defendant not guilty.

In relation to this instruction, it is noted that Michel specifically assigns error to the trial court's "refus[al] to instruct the jury on . . . Michel's mental health related defense." Contrary to his assertion, the trial court did not prevent there from being a jury instruction on "Michel's mental health related defense." While the trial court rejected Instruction D, it did allow an instruction that only differed from Instruction D in one way, which was that it did not have the language "or a lesser-included offense." Because I would find that the trial court did not err in not instructing the jury on a "lesser-included offense," there is also no error in not including "or a lesser-included offense" in the fourth rejected jury instruction.

Conclusion

In summary, by inconsistently applying the general principles of statutory interpretation and conflating alternative theories of felony animal cruelty, the majority opinion incorrectly found the evidence as insufficient to support Michel's convictions and that the trial court erred in its interpretation of Code § 3.2-6570(F) and its denial of Michel's motion to strike. Because the evidence in this case was sufficient to support Michel's convictions and the trial court did not otherwise commit any reversible error, I would affirm the trial court's judgment.